# RICHARD DANNY TICHNELL v. STATE OF MARYLAND

[Nos. 73 and 104, September Term, 1979.]

*Decided June 10, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Clark B. Frame,* with whom was *G. Gary Hanna* on the brief, for appellant.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Thomas J. Saunders, Assistant Public Defender,* on the brief, for the Office of the Public Defender as *amicus curiae.*

*Stephen H. Sachs, Attorney General,* and *Deborah K. Handel, Assistant Attorney General,* for appellee.

MURPHY, C. J., delivered the opinion of the Court. COLE and DAVIDSON, JJ., concur in the result and filed concurring opinions at page 745 *infra.*

In the early morning hours of January 18, 1979, Richard Tichnell and a confederate, Oscar Recek, broke into Davidson's Army-Navy Surplus Store near Oakland, Garrett County, Maryland, and stole ten handguns. Within

minutes after leaving the store, Tichnell was accosted by Deputy Sheriff David Livengood, who had been dispatched to the scene in response to a silent alarm activated by the storehouse breaking. In the course of their encounter, Tichnell shot and killed the deputy. Thereafter, Recek and Tichnell took Deputy Livengood's police cruiser and fled the scene. They were apprehended later that morning in West Virginia. At that time Tichnell admitted to the police that he had shot Deputy Livengood, but he said the shooting was not premeditated and was in justifiable self-defense.

On March 2, 1979, the grand jury of Garrett County charged Tichnell in one indictment with the felonious storehouse breaking of Davidson's store, and with grand larceny of the ten handguns.[1] Another indictment charged Tichnell with the premeditated first degree murder of Deputy Livengood, with felony murder, with murder in the second degree, with manslaughter, and with using a handgun in the commission of a crime of violence.[2] A third indictment charged Tichnell with robbing Deputy Livengood with a deadly weapon and stealing his vehicle, with grand larceny of the deputy's police cruiser, and with a handgun violation.

Upon Tichnell's request for a change of venue, the cases were removed to the Circuit Court for Wicomico County. The three indictments were consolidated for trial by jury before Judge Richard M. Pollitt. Pursuant to Maryland Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, § 412 (b), Tichnell was given timely notice that the State would seek the imposition of the death sentence for the murder of the deputy sheriff.

At the conclusion of the trial on August 23, 1979, the jury found Tichnell guilty of the wilful, deliberate and

---

1. The storehouse breaking count was based on Maryland Code (1957, 1976 Repl. Vol.), Art. 27, § 32 — breaking a storehouse with intent to steal goods of the value of $100 or more.

2. Code, Art. 27, § 407 provides that murder perpetrated "by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree." Section 410 provides that murder committed in the perpetration, or attempted perpetration, of a felonious storehouse breaking or robbery shall constitute murder in the first degree.

premeditated murder of Deputy Livengood. It also found him guilty of storehouse breaking, grand larceny of the guns, and unauthorized use of the deputy's vehicle. After Tichnell waived his statutory right to have a jury determine whether he should be sentenced to death on the murder conviction (*see* Code, Art. 27, § 413), the court imposed the death sentence. Additionally, it imposed terms of imprisonment for the storehouse breaking and grand larceny offenses.

On appeal, Tichnell claims that the court committed numerous prejudicial errors in the course of the pretrial and trial proceedings. He contends that the evidence was legally insufficient to permit the jury to convict him of wilful, deliberate and premeditated murder. He also attacks the constitutionality of Maryland's capital sentencing statute, as well as the imposition of the death sentence in the circumstances of the case.

## I.

At the trial, the State adduced evidence that on January 18, 1979, at approximately 5:25 a.m. an alarm sounded in the Garrett County Central Alarm office, indicating that a break-in had occurred at Davidson's store located on the outskirts of Oakland. Deputy Livengood was immediately notified and drove to the store, accompanied by Sarge, his 108-pound German Shepherd K-9 dog. Officer Roger Lewis of the Oakland Police Department was also alerted, and he too drove to the scene.

The evidence showed that Davidson's store is located between Routes 219 and 4, being approximately equidistant to each road. The two routes parallel each other in a north-south direction. The front of the store is on the Route 219 side. Route 4 is a two-lane road; it is approximately 252 feet from the rear of the store. There is no automobile entrance to the store from Route 4.

Officer Lewis arrived in the front of the store at approximately 5:27 a.m. It was quite windy and light snow was falling; ice and snow covered the ground. Lewis noted

that the front door of the store had been broken open, and a minute or so later he entered the store. Sometime between 5:28 a.m. and 5:31 a.m. Deputy Livengood contacted Officer Lewis by police radio, advising him that he was proceeding to investigate a "suspect vehicle." He told Lewis to remain in his car in front of the store.

Between 5:30 and 5:35 a.m., James Wolfe, whose house overlooks Route 4 immediately behind Davidson's store, was leaving for work when he heard some yelling on the road. From a distance of approximately 460 feet, he observed a car, facing north, stopped on Route 4 with its headlights on, and a dog pacing back and forth in front of the headlights. After about ten seconds the dog disappeared, and fifteen seconds later Wolfe heard a burst of shots, followed by a split second pause, the sound of tires spinning and a simultaneous second burst of shots. Wolfe then saw a faint vision of a second car, without headlights, move in a southerly direction on Route 4 about twenty to thirty feet, after which he heard a "thump." Wolfe went into his house and called the sheriff's office; the time was then about 5:37 a.m. A few minutes later, Wolfe noticed the vehicle with the headlights leave the area. At 5:50 a.m., Wolfe drove on Route 4 behind Davidson's store and observed Deputy Livengood lying facedown at the edge of the northbound lane of the road. Wolfe promptly notified the sheriff's office and Officer Lewis and others immediately responded to the scene.[3]

Deputy Livengood had been shot seven times and was dead. His .38 caliber service revolver with three live and three spent cartridges was located beneath his body. A pair of handcuffs was found in the road about twenty-three feet from the deputy's body. Livengood's police cruiser was missing. His K-9 dog, Sarge, had been stabbed in the left shoulder region and his tongue had been deeply cut. The dog was lying off the road about twenty-six feet from the deputy's body when the investigating officers arrived at the scene; the dog died shortly thereafter. A 1965 Plymouth,

3. In accordance with Livengood's instructions, Lewis had remained in his police car in front of the store. He did not hear the shooting.

later identified as belonging to Tichnell, was observed partially off Route 4 in a snow-filled ditch, lodged against a wire fence and post; the vehicle was facing south, approximately forty feet from the deputy's body. The right passenger window was open. Two bullet holes were observed in Tichnell's car. One shot had struck the left front door of the vehicle near the door lock; the other hit the left front area of the doorpost. A 9 millimeter Browning semiautomatic revolver, later identified as the homicide weapon, and owned by Tichnell, was found on the front seat of his car. The gun contained seven empty shells and seven loaded cartridges; two of the spent cartridges were found on the floor of Tichnell's car behind the driver's seat; the other five casings were scattered about Route 4 in a cluster near the deputy's body. A fully loaded Smith and Wesson .38 revolver that had been stolen from Davidson's store three days earlier was also recovered from a field near the store close to Route 4.

At approximately 5:45 a.m. on the morning of the shooting, at a point about six miles from Oakland, Jerry Wilson saw a speeding car run a stop sign, hit a guard rail and go over an embankment. Two men ran from the vehicle, which was later identified as Deputy Livengood's police cruiser. At about 6 a.m., two armed men gained entry into the residence of Clifford Friend, which was located about 500 yards from the wrecked police cruiser. According to the testimony of Friend's twenty-year-old son, Carl, one of the men, who had a shoulder wound and was wearing a ski mask, said that he had "just shot and killed a fellow." Carl testified that the men demanded the keys to his car, tied up the four members of the family, ripped out the telephone wires, took $20 from him, a camera and a hat, and departed driving his 1978 Camaro. The Friends reported the incident to the police, including the make and license number of Carl's car.

At approximately 9:30 a.m. that morning, West Virginia State Police Troopers observed Tichnell and Recek driving Carl Friend's car, and they arrested the two men. Among

other items removed from the car were a bag containing the handguns stolen from Davidson's and a samurai sword with dog blood and dog hair on it. The bag also contained a shoulder holster capable of accommodating a 9 millimeter Browning semiautomatic; it was stained with blood of a type matching Tichnell's. The troopers observed that Tichnell had a gun shot wound in his right shoulder, a one and one-half inch laceration over his right eye, and a crushed tooth.

On the day of his arrest, after he had been treated for his wounds, Tichnell gave the police two statements, both of which were admitted into evidence without objection as to their voluntariness. In the statements, Tichnell said that on the night of January 17, 1979, he and Recek, a casual acquaintance, had been drinking together in Fairmont, West Virginia. Tichnell said he was a little intoxicated because between the hours of 11 p.m. on January 17 and 3:30 a.m. on January 18, he had consumed six to eight beers at one place, four to five Black Russians at a second place, and used 1/6 of an ounce of marijuana. Tichnell told Recek that he had broken into Davidson's store on January 15, 1979 and had taken a .38 Smith and Wesson gun. The two men decided to return to Davidson's that night to steal more guns, and they drove to Oakland in Tichnell's car. Tichnell parked the car in a driveway beside a barn located behind Davidson's. They broke the lock on the front door of the store, entered and broke into a handgun showcase at the rear of the store, removing some handguns. After being in the store for about three to five minutes, Tichnell said that they left through the front door and walked back to the car. Recek then discovered that he had lost the loaded gun which he had been carrying. Because it was the same weapon that Tichnell had stolen from Davidson's on January 15, and had given to Recek that night, Tichnell told Recek to go back and find it. Rather than risk detection, Tichnell said he drove about the Oakland area to give Recek time to find the lost gun. As he was returning to the store, driving on Route 219, he observed what he thought were two police cruisers in front of the store. He proceeded past the store on to Route 4, southbound,

in order to pick up Recek behind the store. As Tichnell approached the rear of the store on Route 4, he saw a police cruiser facing north, blocking his lane. At this precise moment, Tichnell said that his car headlights, which had been defective for some time, went out. He observed that an officer, gun in hand, had apprehended Recek and had him lying on the ground. Tichnell said he stopped his car about fifteen to twenty feet from the police car and got out to repair his headlights. At this time, the officer pointed his weapon at him and told him to lie down on the road. Tichnell complied and he heard the deputy order his K-9 dog to watch him. The dog stood over Tichnell and as he looked up the dog bit him on the side of his eye and through the inside of his mouth. Tichnell said that he screamed out with pain, became hysterical, and started running around in a circle to avoid the dog. Believing that the dog had torn his eye out, Tichnell ran to his car to get a medical aid kit which he kept in the back seat. At this point Tichnell heard the deputy order the dog to watch Recek; the deputy then followed Tichnell to his car, spun him around and placed a gun in his face. At this time, the door on the driver's side of Tichnell's two-door vehicle was open. Tichnell said he moved the deputy's weapon from his face and requested that the officer permit him to tend to his wounded eye. Tichnell stated that the deputy then put his gun against his (Tichnell's) shoulder and shot him from a distance of about a foot and a half. Tichnell said that the shot knocked him into his car and that he grabbed the barrel of the deputy's gun as he fell. Tichnell said that the deputy then tried to bring his gun down for another shot. While still holding the deputy's gun, Tichnell said he reached for his own gun which he kept under the front seat of his car. As the scuffle continued, the deputy fired again, the bullet narrowly missing the top of Tichnell's head. Tichnell stated that because he thought the deputy was going to shoot him again, he fired four or five shots at the deputy at point-blank range. He said that the first shot struck the deputy in the head, and he was certain that he was dead.

Tichnell acknowledged in his statements that he and

Recek attempted to leave the scene in Tichnell's car. After moving about thirty or forty feet, Tichnell said that the car slid on the ice and went off the road into a ditch. Realizing that his car was stuck, Tichnell decided to take the deputy's cruiser, but found the dog sitting in the front seat. As Recek attempted to get in the open door of the car, the dog lunged at him. Tichnell thereupon removed his samurai sword from his car and stabbed the dog behind its left shoulder; when he withdrew the sword, the dog rolled out of the car. Tichnell said that he and Recek then fled in the deputy's cruiser but subsequently wrecked it. Thereafter, he and Recek gained entrance to a nearby house, tied up the four members of the family and took their car. Before departing, Tichnell acknowledged telling one member of the family that he had gotten into a "skirmish" with a police officer and had to kill him. Tichnell said he was wearing a ski mask when he first entered the Friend home for the purpose of covering his bleeding face. He said he thereafter took the mask off and showed his face to the Friend family.

Other evidence adduced by the State showed that of the seven shots fired into the deputy's body, two were fatal, one in the lower back and the other in the back of the head. No powder burns were found on the clothing or upon the wounds of either Tichnell or the deputy. Expert testimony revealed that had the shots been fired at a range less than three feet, as Tichnell claimed, burned powder residue would have been found on the clothing or wounds of both the deputy and Tichnell. The expert witnesses concluded that the shots were fired at a distance greater than three feet.

There was evidence that Tichnell's blood type was found on broken glass fragments from the windshield of the deputy's car, suggesting that the laceration over Tichnell's eye may have been received at the time the car was wrecked near the Friend home. Except for Tichnell's statements, there was no evidence that the laceration was caused by a dog bite.

Testimony was received from First Sergeant John Dobb, who was in charge of training K-9 dogs for the Maryland State Police. He explained that a K-9 dog is trained to break

any prior command and to attack any person who is attacking his handler. Sgt. Dobb, who trained Sarge, said that the dog was outstanding in attack and handler protection work. This evidence was produced to refute Tichnell's statement that Sarge continued to watch Recek throughout the entire encounter with Deputy Livengood.

Evidence was also adduced by the State showing that Tichnell's shoulder holster, which was recovered from Carl Friend's car at the time of Tichnell's arrest, was stained with blood. From this evidence, the prosecution sought to establish that Tichnell was wearing the holster at the time he was shot in the shoulder and was carrying the murder weapon in it when he broke into the store with his armed confederate Recek.

The prosecution introduced evidence intended to refute Tichnell's claim that he drove about Oakland while he was waiting for Recek to find the lost gun. This evidence tended to show that, in view of the time involved between the break-in at the store, and the shooting of the deputy, Tichnell could not have traversed the route around Oakland which he said he had taken.

Also introduced into evidence was Tichnell's medical aid kit. Unlike the stolen guns, and the samurai sword, the kit had been left behind in Tichnell's car when he and Recek fled from the crime scene in the deputy's police cruiser.

Tichnell testified in his own behalf. He said that he was thirty-two years of age, a high school graduate, married with one child, had no criminal record, and collected weapons as a hobby. He had been a paramedic in the Army for several years and had worked at a steel mill as a laborer. He had been unemployed for over two years immediately prior to the shooting. In his testimony, Tichnell said that when the deputy first accosted him on Route 4, he was made to lie down in the street at a point approximately six to ten feet in front of his vehicle. In this position, Tichnell said he was between his car and Livengood's cruiser, and that the two vehicles were about twenty feet apart. Recek was lying about three feet from the deputy's cruiser and the dog was pacing back and forth.

Tichnell described his actions after the dog bit him:

"I just jumped to my feet, running in a tight circle to keep away from the dog, plus I was blind in both eyes. I couldn't see for approximately three or four minutes, until the vision started coming back in my left eye and I could see my car and the headlights.

"At that time I made a run for my open car door to obtain the medical aid bag in the back of the car so I could apply a wet bandage to my eye in case it was out, to see if there could be anything preserved.

"At that time I was leaning into the back seat, I heard the officer putting the dog — told him to watch Oscar — and I heard him running towards me. This was about the same time that I was running. At this time I was screaming hysterically.

"I opened the back seat to reach in. That is when he reached across the window and spun me around. And when he spun me around he placed his weapon in my face, and I moved it — excuse me — I moved the weapon out of my line of vision and asked him not to put it in my face. I put my hands back in the air.

"At that time he fired a round into my right shoulder, spinning me back towards the car. At this time I grabbed the barrel of his weapon as I was falling and stuck out my left arm to break my fall, to prevent him from shooting me again. At this time I glanced off the seat with my hand and fell directly upon my Browning high power.

"Struggling to get out of the car he fired another round at me with both hands on the weapon. At this time I shoved his weapon upward and ducked and the bullet tore through my hair. At that time I just pulled the hammer back, and he was coming back down with his weapon and I was coming up with mine, and I exchanged several shots."

Tichnell's testimony was consistent with the statements he had given to the police at the time of his arrest. Recek, who was also under indictment for murder, did not testify.

Judge Pollitt instructed the jury, in accordance with Tichnell's defense, as follows:

"If you believe from the evidence that on the date in question near this Discount Store in Oakland the defendant, Richard Tichnell, was apprehended by Deputy Sheriff Livengood for breaking and entering the store and had surrendered, and that thereafter while being guarded by the dog he was bitten on the face and ran to his car to obtain medical treatment, and was not attempting to evade or resist arrest and was not attempting to harm Deputy Sheriff Livengood, and that at that time Officer Livengood started shooting at the defendant, then in such circumstances the defendant may use whatever force is necessary to repel the attack, and in so doing would be exercising the right of self defense and would not be guilty of felonious homicide in such circumstances.

"In other words, if at the time of the shooting the defendant had peacefully submitted to arrest and was thereafter shot by the arresting officer while attempting to get medical attention, then the defendant would have a right of self defense and could use such force as was reasonably necessary to prevent death or serious bodily harm to himself.

"In order to apply the doctrine of self defense you must find that the felony of storehouse breaking was over and completed and that the defendant had submitted to arrest, because the defense of self defense is not available in cases of felony murder. In cases of felony murder the defendant is the aggressor engaged in the commission of a felony.

"A person may use a reasonable amount of force in self defense, including in some circumstances deadly force. If the defendant actually believed that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, and had

reasonable grounds to so believe, then he had a
right to employ deadly force in order to defend
himself."

In view of the evidence presented, the State maintained
that the shooting did not occur as Tichnell had related it, but
rather that Tichnell murdered the deputy in cold blood as he
was interrupted in his departure from the scene of the
storehouse breaking; consequently, the prosecution urged
that Tichnell was guilty of felony murder committed in the
course of the storehouse breaking and of wilful, deliberate
and premeditated murder.[4]

The jury rejected Tichnell's version of the shooting and
found him guilty of wilful, deliberate and premeditated first
degree murder under detailed instructions from Judge
Pollitt, to which no exceptions were taken.

## (A)

Tichnell contends that Judge Pollitt committed reversible
error in consolidating the three indictments for trial over his
objection. He relies upon *McKnight v. State,* 280 Md. 604,
375 A.2d 551 (1977), where we delineated the three types of
prejudice to an accused that may result from an improper
joinder of indictments, viz.:

"First, [the accused] may become embarrassed, or
confounded in presenting separate defenses. ...
Secondly, the jury may cumulate the evidence of the
various crimes charged and find guilt when, if the
offenses were considered separately, it would not do
so. At the very least, the joinder of multiple charges
may produce a latent hostility, which by itself may
cause prejudice to the defendant's case. Thirdly, the
jury may use the evidence of one of the crimes
charged, or a connected group of them, to infer a
criminal disposition on the part of the defendant

---

**4.** The State abandoned the robbery count before the jury retired to
consider its verdicts.

> from which he may also be found guilty of other crimes charged."
>
> 280 Md. at 609 (citations omitted).

Tichnell argues that he was prejudiced by the joinder of the three indictments for reasons identical to those set forth in *McKnight* and reiterated in *State v. Jones,* 284 Md. 232, 395 A.2d 1182 (1979).

Maryland Rule 745 a provides that the court may order two or more charging documents to be tried together "if the offenses ... could have been joined in a single charging document." Rule 712 a provides that two or more offenses may be charged in the same charging document "if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Rule 745 c provides:

> "If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents or defendants, the court may, upon its own motion or the motion of any party, order separate trials of counts, charging documents or defendants, or grant any other relief justice requires."

Interpreting these rules, *McKnight* and *Jones* held that a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each offense would not be mutually admissible at separate trials.

In seeking joinder of the indictments for trial, the prosecution proffered that unlike *McKnight* the crimes charged were related, occurred within ten or fifteen minutes of each other, and constituted one continuous and uninterrupted criminal transaction. In ordering the consolidation under Rule 745 a, Judge Pollitt agreed with the State's position, noting in addition that to prove the commission of a felony murder, the prosecution would have to establish the underlying felony of either storehouse breaking or robbery, both crimes being charged in the other indictments joined for trial.

We think the joinder was proper in this case under Rule 745 a because all the offenses charged were related and were "based on the same act or transaction or on two or more acts or transactions connected together . . . ." Rule 712 a. As the State maintains, the offenses were so intertwined that one could not be proved without producing evidence of the other.

*McKnight* involved four independent and distinct robberies, committed in the same neighborhood, over a one-month period. That case recognizes that where offenses, even of a similar character, are joined for trial, under circumstances where the evidence as to each offense would not be mutually admissible at separate trials, the prejudicial effect of such evidence is apt to outweigh its probative value. Where, however, the evidence of other crimes would be mutually admissible, joinder is within the trial court's sound discretion.

It is, of course, well settled that evidence of other offenses independent of the particular crime charged is inadmissible, unless the evidence is substantially relevant for some other purpose than to show that the accused committed the crime on trial because of his criminal character. *Cross v. State,* 282 Md. 468, 473, 386 A.2d 757 (1978); *McKnight, supra,* 280 Md. at 612; *Ross v. State,* 276 Md. 664, 669, 305 A.2d 680 (1976). The primary policy consideration underlying this rule is that this type of evidence will prejudice the jury against the accused because of the jury's tendency to infer that the accused is a "bad man" who should be punished regardless of his guilt of the charged crime, or to infer that he committed the charged crime due to a criminal disposition. 1 J. Wigmore, *Evidence* § 57, at 454-56 (3d ed. 1940).

Some of the well-established categories of evidence outside the ambit of the narrow rule of exclusion include evidence of other crimes which tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the

commission of a crime on trial. Other exceptions have been recognized as well. *See, e.g., State v. Jones, supra,* 284 Md. at 238; *Cross v. State, supra,* 282 Md. at 473-74; *McKnight, supra,* 280 Md. at 612; *Ross, supra,* 276 Md. at 669-70. One such exception permits the admission of evidence of other crimes when the several offenses are so connected or blended in point of time or circumstances that they form one transaction, and cannot be fully shown or explained without proving the others. *See, e.g., Cross, supra,* 282 Md. at 474; *Bryant v. State,* 207 Md. 565, 115 A.2d 502 (1955); *Wood v. State,* 191 Md. 658, 62 A.2d 576 (1948); *Berger v. State,* 179 Md. 410, 20 A.2d 146 (1941); *Mitchell v. State,* 178 Md. 579, 16 A.2d 161 (1940); *McCormick on Evidence* § 190 (2d ed. 1972); 1 J. Wigmore, *Evidence* § 218 (3d ed. 1940).

*State v. Jones, supra,* upon which Tichnell relies, does not require a severance of the offenses. In that case, the defendant was convicted of first degree murder, armed robbery, two charges of attempted armed robbery, and two handgun violations. At issue was whether the trial court abused its discretion in denying the defendant's motion for a severance. The evidence showed that the defendant and several others decided to commit some robberies to obtain money to buy drugs. They drove around Baltimore City and robbed or attempted to rob persons at three different business establishments within the course of two and one-half hours. In producing evidence of the various offenses, the State relied on the "common scheme" exception to the general exclusionary rule. Under the facts of the case, however, we held, Judge Cole speaking for the Court, that the State failed to prove a single inseparable plan encompassing the offenses and did not establish

> "that the various acts constituting the offenses naturally relate to one another by time, location, circumstances and parties so as to give rise to the conclusion that they are several stages of a continuing transaction." 284 Md. at 243.

Because the offenses did not fall within the common scheme exception upon which the State relied, we held that the trial

court abused its discretion in failing to grant a severance. As we have indicated, the offenses consolidated for trial were closely related to each other and occurred within a fifteen-minute period within a tightly confined area near Davidson's store. Among other reasons, the proximity of time and space within which the offenses were committed distinguishes this case from *Jones.*

We conclude that the trial judge did not abuse his discretion in consolidating the three indictments for trial and that Tichnell was not prejudiced by the joinder for any of the reasons claimed under *McKnight.*[5]

### (B)

Tichnell contends that he was obliged to ask for a change of venue from Garrett County, but that he was prejudiced by the removal to Wicomico County, some 300 miles to the east. He contends that he was thereby denied his constitutional right under Art. 20 of the Maryland Declaration of Rights to try the facts of the case where they arose.[6] He also contends that he was entitled to be tried by a jury of his peers under Art. 24 of the Declaration of Rights, but that a Wicomico County jury did not constitute a jury of his peers in a case arising from Garrett County, high in the Appalachian mountain region.[7] These contentions are devoid of merit.

Tichnell did not object to the removal of the case to Wicomico County, nor did he seek a further removal to another county.[8] Under these circumstances, the claims of

---

5. The "identity" and "common scheme" exceptions to the other crimes rule are not applicable in the circumstances of this case. Because Tichnell admitted his identity at the outset of the trial, the identity exception was inapplicable. P. Herrick, 1 *Underhill's Criminal Evidence* § 210 at 637 (6th ed. 1973). The common scheme exception was inapplicable because the crimes charged in the three indictments did not encompass a "single inseparable plan." State v. Jones, *supra,* 284 Md. at 241-42.

6. Art. 20 provides: "That the trial of facts where they arise, is one of the greatest securities of the lives, liberties and estate of the People."

7. Art. 24 provides that "no man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

8. Art. 4, Sec. 8 of the Maryland Constitution makes provision for an automatic right of removal in a capital criminal case "to some other court having jurisdiction in such case for trial . . . ."

prejudicial removal and violation of Art. 20 are not properly before us. Maryland Rule 885. The right under Art. 24 to a judgment by one's peers guarantees trial by jury. *See Wright v. Wright's Lessee,* 2 Md. 429, 452 (1852). Although Art. 21 further guarantees the right to an impartial jury, *Couser v. State,* 282 Md. 125, 383 A.2d 389 (1978), an accused, of course, does not have the right to be tried by any particular jury or jurors. *See, e.g., Kinsey v. State,* 49 Ariz. 201, 65 P.2d 1141, 1148 (1937); *Nail v. State,* 231 Ark. 70, 328 S.W.2d 836, 841-42 (1959); *People v. Howard,* 211 Cal. 322, 295 P. 333, 334 (1930); *State v. Critelli,* 237 Iowa 1271, 24 N.W.2d 113, 118 (1946).

Tichnell next contends that he was denied a fair and impartial jury trial because a hostile atmosphere was generated (a) by a parade of police officers, and other persons associated with police programs, all of whom testified for the State at the trial, (b) by a number of "erratic statements" made by the prosecutor to the jury based on speculation rather than evidence, and upon other prosecutorial misconduct, (c) by the trial judge overruling defense objections and motions on evidentiary issues, thus damaging his record, (d) by displaying inflammatory exhibits to the jury, and also boxes containing exhibits which were marked in large black letters as relating to the "murder" of the deputy, and (e) by undue reference to Tichnell as a West Virginian.

We have carefully reviewed the record and conclude that these contentions, which represent bald allegations at best, unsupported by specifics, are without merit.

Tichnell also contends that Judge Pollitt did not give adequate instructions to the jury and in particular failed clearly to instruct the jury that the burden was on the State to prove beyond a reasonable doubt that he did not act in self-defense when he shot the deputy. Since Tichnell did not object to the detailed instructions given by Judge Pollitt, review as of right is precluded. Maryland Rule 757. Moreover we see no plain error in the court's jury instructions, including its instructions pertaining to the

State's burden of proof on Tichnell's claim of self-defense. *See State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976).[9]

## (C)

Tichnell contends that the trial court improperly admitted evidence pertaining to crimes committed at the Friend residence. He points out that he was not on trial for any of these offenses, and claims that he was prejudiced by the admission of this evidence, *i.e.,* the testimony of Carl Friend that Recek and a man wearing a ski mask had entered the Friend residence brandishing guns, tied up the members of the family, stole Carl's car, $20 in cash, a camera and a hat.

Tichnell objected to Friend's testimony on relevancy grounds. He advised the court before Friend testified that his identity as one of the persons who entered the Friend home would be admitted. He claimed that "proving other crimes which are not charged in the indictment ... will certainly taint this jury should they be called upon to pass upon the death sentence." Judge Pollitt ruled that evidence of flight was relevant and had a bearing on the consciousness of guilt and was admissible even if "in the process it happens to show the commission of some other crimes."

The State argues that under *Cross v. State, supra,* it is permissible to introduce evidence of crimes other than those on trial to establish motive, intent, identity or a common plan. It contends that Tichnell's conduct, appearance and conversation, at a time shortly after the killing, were directly relevant to his state of mind. According to the State, the continuation of flight, the attempt at disguise, and the statements made by Tichnell at the Friend house prove the intent and motive accompanying the earlier crimes.

We think that Tichnell waived his objection to the admission of the contested evidence. While he objected to Friend's testimony before it was given, and moved

9. The jury was instructed: "The State has the burden of proving based upon the evidence introduced at trial every fact necessary to convict the defendant of the crimes with which he is charged. This burden remains with the State throughout the trial. The defendant does not have the burden of proving his innocence or producing any evidence."

unsuccessfully for a mistrial after it was given, he did not thereafter object to the admission of his first statement to the police, which recounted the crimes committed at the Friend home. Nor did he object to the admission of his second statement, which also contained details concerning the commission of these offenses. Under Maryland Rule 522 d 2, it is not reversible error when evidence, claimed to be inadmissible, is later admitted without objection. *See, e.g., Robeson v. State,* 285 Md. 498, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021; *S & S Bldg. Corp. v. Fidelity Storage,* 270 Md. 184, 310 A.2d 778 (1973); *Peisner v. State,* 236 Md. 137, 144, 202 A.2d 585 (1964), *cert. denied,* 379 U.S. 1001, 85 S. Ct. 721, 13 L. Ed. 2d 702 (1965); *Hyson v. State,* 225 Md. 140, 169 A.2d 449 (1961) (per curiam); *Journigan v. State,* 223 Md. 405, 412, 164 A.2d 896 (1960); *State Roads Comm. v. Bare,* 220 Md. 91, 94, 151 A.2d 154 (1959).[10] On direct examination, Tichnell testified to the events at the Friend house and to his seizure of Carl Friend's vehicle. His testimony was consistent with his earlier statements to the police, which were admitted in evidence without objection. Tichnell's own testimony having confirmed the evidence to which he had previously objected, no reversible error exists. *See Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979); *Robeson v. State, supra,* 285 Md. at 506-07; *Peisner v. State, supra,* 236 Md. at 144-45; *Connor v. State,* 225 Md. 543, 555, 171 A.2d 699, *cert. denied,* 368 U.S. 906, 82 S. Ct. 186, 7 L. Ed. 2d 100 (1961). Thus, even assuming the evidence of other crimes committed at the Friend residence was inadmissible, Tichnell nevertheless wavied his objection to such evidence.[11]

---

**10.** It is of no assistance to Tichnell that he belatedly objected to the admission of the part of the second statement which covered the Friend incident. Nor does it help his argument that he moved for a mistrial at the close of the State's case-in-chief on the ground that evidence of the Friend offense was inadmissible.

**11.** While we do not decide the question, we note the existence of cases holding that evidence of flight, even though it may show the commission of other crimes by the defendant, is admissible to show intent or consciousness of guilt. *See, e.g.,* Westcoat v. State, 231 Md. 364, 190 A.2d 544 (1963); Clay v. State, 211 Md. 577, 585, 128 A.2d 634 (1957); United States v. Peltier, 585 F.2d 314, 322-25 (8th Cir. 1978), *cert. denied,* 440 U.S. 945, 99 S. Ct. 1422, 59 L. Ed. 2d 634 (1979); Meredith v. State, 247 Ind. 233, 214

## (D)

Tichnell contends that in view of the evidence at the trial, including the evidence that the shooting of the deputy was in self-defense, the jury could not rationally find, beyond a reasonable doubt, that he was guilty of wilful, deliberate and premeditated first degree murder. We disagree.

In *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), the Surpeme Court held that the due process standard recognized in In re Winship, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), requires that the following standard be applied in a review of the sufficiency of the evidence to support a criminal conviction: "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." 443 U.S. at 318. This standard does not require a court to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " *Id.* at 318-19 (emphasis in original). Instead, the standard to apply is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

The principles of law applicable to determining whether a felonious homicide constitutes a wilful, deliberate and premeditated murder are well settled. For a killing to be "wilful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of

---

N.E.2d 385, 386-87 (1966); State v. Davies, 350 So. 2d 586, 588-89 (La. 1977); Commonwealth v. Gilday, 367 Mass. 474, 327 N.E.2d 851, 864 (1975); Williams v. State, 85 Nev. 169, 451 P.2d 848, 852 (1969); State v. Jones, 292 N.C. 513, 234 S.E.2d 555, 561-62 (1977); State v. Ross, 92 Ohio App. 29, 108 N.E.2d 77, 83-84 (1952); Whittington v. State, 580 S.W.2d 845 (Tex. Cr. App. 1979); Thames v. State, 453 S.W.2d 495, 500-01 (Tex. Cr. App. 1970); *Underhill's Criminal Evidence, supra,* § 206 at 604.

time. Their existence is discerned from the facts of the case. *E.g., Gladden v. State,* 273 Md. 383, 387, 330 A.2d 176 (1974); *Robinson v. State,* 249 Md. 200, 208-09, 238 A.2d 875, *cert. denied,* 393 U.S. 928, 89 S. Ct. 259, 21 L. Ed. 2d 265; *Chisely v. State,* 202 Md. 87, 106-07, 95 A.2d 577 (1953). If the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder. *Wilson v. State,* 261 Md. 551, 565, 276 A.2d 214 (1971); *Hyde v. State,* 228 Md. 209, 215-216, 179 A.2d 421 (1962). Of course, an inference of a specific intent to kill may arise from the use of a deadly weapon against a vital part of the body. *See, e.g., State v. Evans, supra,* 278 Md. at 205; *Davis v. State,* 204 Md. 44, 51, 102 A.2d 816 (1954).

To justify a homicide on the basis of self-defense (other than felony murder)

> "the accused must have had reasonable grounds to believe, and have in fact believed, himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant. . . . In Maryland it is for the trier of the facts to determine whether the accused was justified in meeting force with force. If justification be found to have existed, the force used must not have been 'unreasonable and excessive', that is, must not have been more force 'than the exigency reasonably demanded.' "
>
> *Guerriero v. State,* 213 Md. 545, 549, 132 A.2d 466 (1957) (citations omitted).

*Accord, DeVaughn v. State,* 232 Md. 447, 453, 194 A.2d 109 (1963), *cert. denied,* 376 U.S. 927, 84 S. Ct. 693, 11 L. Ed. 2d 623; *Bruce v. State,* 218 Md. 87, 96-97, 145 A.2d 428 (1958). As the record reveals that Tichnell introduced evidence sufficient to generate a jury issue with respect to self-defense, the State had the burden of negating the defense. *State v. Evans, supra,* 278 Md. at 207-08.

The jury was not obliged to believe Tichnell's version of the shooting and it did not. From the evidence in the case, the jury could rationally find, beyond a reasonable doubt, that Deputy Livengood was not shot while he struggled with Tichnell at the door of Tichnell's car. Wolfe's testimony showed that there was a burst of gunfire, followed almost immediately by the sound of spinning wheels and a simultaneous volley of additional shots — a version wholly inconsistent with Tichnell's statements and testimony. The absence of gunshot powder burns on either the deputy's or Tichnell's clothing also contradicted Tichnell's statements that the shots were fired at point-blank range. The five spent shells found in close proximity to the deputy's body constituted evidence that he was shot at some distance from Tichnell's car. The jury could find from the evidence that Tichnell was lying when he said he drove around Oakland while waiting for Recek to find the lost gun. It could have found that Tichnell was lying about being bitten by the K-9 dog, about the dog's inaction during the alleged struggle at the car, and about the stabbing of the dog inside of the deputy's cruiser. It could have found from the wounds suffered by the deputy that the fatal shots were fired into his body from behind when he was investigating the suspect vehicle observed at the scene.

The jury could have found from the evidence of the bloody holster that Tichnell was lying when he said he was unarmed when be broke into Davidson's store and when he first confronted the deputy on or near Route 4. And the jury could have found from the course of Tichnell's flight, and his actions during that time, that he was conscious of his guilt — a circumstance at variance with his later statements that the killing was in justifiable self-defense. In sum, the evidence supplied to the jury provided an ample basis to find wilful, deliberate and premeditated first degree murder under the test articulated in *Jackson v. Virginia, supra.* In so concluding, we are not unmindful of the principle that the firing of two or more shots separated by an interval of time may be viewed as evidence of premeditation. *See Wilson v. State, supra; Cummings v. State,* 223 Md. 606, 165 A.2d 886

(1960); *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953). *Fuller v. State,* 45 Md. App, 414, 413 A.2d 277 (1980).

## II

## (A)

Tichnell next contends that Maryland's death penalty statute, ch. 3 of the Acts of 1978, now codified as Maryland Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, §§ 412-414, is facially unconstitutional since it imposes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the federal constitution and Art. 25 of the Maryland Declaration of Rights.[12]

By ch. 115 of the Acts of 1908, the General Assembly invested trial courts of general jurisdiction with the discretion to sentence a person convicted of first degree murder to either death or life imprisonment. In *Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Supreme Court declared in a per curiam opinion that death sentences administered under such discretionary statutes constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the federal constitution. Five Justices supported the Court's per curiam decision; four Justices dissented. Justices Brennan and Marshall found the imposition of the death penalty unconstitutional as constituting cruel and unusual punishment in all cases. Justice Douglas concluded that sentencing procedures, which vested judges or juries with uncontrolled discretion in deciding whether to impose either capital punishment or imprisonment, led to arbitrary and discretionary application of the penalty to unpopular groups, thus violating the concept of equal protection implicit in the

---

12. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Art. 25 provides: "That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."

ban on cruel and unusual punishments. Justice Stewart also focused on the administration of the penalty and concluded, in part, that the death sentences before the Court were cruel and unusual because they were wantonly and freakishly imposed upon a capriciously selected few. Focusing on the infrequent imposition of the penalty and the lack of a meaningful basis for distinguishing the cases in which death is imposed from the cases in which it is not, Justice White found such a discretionary imposition of the death penalty to constitute cruel and unusual punishment. A central theme of the four dissenting Justices (Burger, Blackmun, Powell and Rehnquist) was the appropriateness of judicial deference to society's will as manifested in the legislative enactment of discretionary death penalty statutes.

Based on its decision in *Furman,* the Supreme Court vacated the death sentences in all of the pending cases on its docket, and remanded them for further proceedings. The response to *Furman* was varied. Some jurisdictions read *Furman* as requiring a mandatory death penalty, while others construed the decision merely to forbid unbridled discretion in capital sentencing statutes.

In *Bartholomey v. State,* 267 Md. 175, 182, 297 A.2d 696 (1972), we declared Maryland's then existing death penalty statutes unconstitutional. We said:

> "We entertain not the slightest doubt that the imposition of the death sentence under any of the presently existing discretionary statutes of Maryland which authorize, but do not require, that penalty is unconstitutional under *Furman* as violative of the Eighth and Fourteenth Amendments to the federal constitution. In other words, we think the net result of the holding in *Furman* is that the death penalty is unconstitutional when its imposition is not mandatory." 267 Md. at 184.

The General Assembly responded to *Furman* and *Bartholomey* by enacting a mandatory death penalty statute. Ch. 252, Acts of 1975, codified as Maryland Code

(1957, 1976 Repl. Vol.), Art. 27, § 413. Under this legislation, the death penalty had to be automatically imposed upon conviction of a specifically defined and narrowly drawn class of first degree murders.

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976), and *Roberts v. Louisiana,* 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 2d 974 (1977), the Supreme Court held that mandatory death penalty statutes for first degree murder were unconstitutional because, as stated in *Woodson,* they lacked

"the fundamental respect for humanity underlying the Eighth Amendment ... [which] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. at 304 (citation omitted).

The Court identified other constitutional shortcomings of a mandatory death penalty statute. It said in *Woodson* that such mandatory measures violated contemporary standards of civilization, *id.* at 289-301, and impermissibly vested standardless sentencing discretion in juries, *id.* at 302-03.

In accordance with *Woodson* and *Roberts,* we held that Maryland's mandatory death penalty statute was unconstitutional. *Blackwell v. State,* 278 Md. 466, 365 A.2d 545 (1976), *cert. denied,* 431 U.S. 918, 97 S. Ct. 2183, 53 L. Ed. 2d 229 (1977). The statute, we said, was constitutionally defective because it did not provide sufficient

"standards whereby the sentencing authority can consider the individual circumstances or characteristics of either the offense or the offender; indeed, all those convicted under the statute are treated alike, without regard to the circumstances." 278 Md. at 472.

In the aftermath of *Furman,* the Supreme Court not only considered the constitutionality of mandatory death penalty statutes, but also addressed the constitutionality of "guided discretion" statutes. It upheld the death penalty statutes of Georgia, *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); Florida, *Proffitt v. Florida,* 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); and Texas, *Jurek v. Texas,* 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). In *Gregg,* the Court rejected the argument that the death penalty constitutes cruel and unusual punishment under all circumstances. 428 U.S. at 168-87. The Court's plurality opinion approved the constitutionality of guided discretion capital sentencing statutes. It construed *Furman* as holding that the death penalty could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. It further stated:

> "Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 188.

The death penalty statutes upheld by the Court in *Gregg, Proffitt* and *Jurek* each contained three provisions which guarded against the concerns raised in *Furman.* First, each of the new discretionary statutes provided for a bifurcated trial so that guilt and punishment would be separately determined. Second, imposition of the death penalty was restricted to cases in which certain aggravating circumstances were established. The sentencing authority was also required to consider the existence of mitigating circumstances. The Court stated in *Jurek v. Texas, supra,* 428 U.S. at 274, that this type of provision

> "guides and focuses the [sentencing authority's] objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death."

Finally, the statutes that were upheld provided for expedited appellate review of the death penalty statute as a check against the random or arbitrary imposition of the death penalty.

Maryland's current capital sentencing statute, Art. 27, §§ 412-414, enacted following our decision in *Blackwell v. State, supra,* retains the death penalty for first degree murder.[13] The guilt or innocence of an accused charged with first degree murder, who is properly notified of the State's intent to seek the death penalty, is determined in the traditional manner either by the court or a jury as the first step of a bifurcated trial. As soon as practicable after the defendant is found guilty of first degree murder, a separate sentencing proceeding must be held to determine whether death or life imprisonment should be imposed. § 413 (a). Section 413 (b) provides that this proceeding shall be heard:

"(1) Before the jury that determined the defendant's guilt; or

(2) Before a jury impaneled for the purpose of the proceeding if:

(i) The defendant was convicted upon a plea of guilty;

(ii) The defendant was convicted after a trial before the court sitting without a jury;

(iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or

(iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or

(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant."

---

13. Section 412 (b) provides that

"[a] person found guilty of murder in the first degree shall be sentenced either to death or to imprisonment for life. The sentence shall be imprisonment for life unless (1) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, and advised the person of each aggravating circumstance upon which it intended to rely, and (2) a sentence of death is imposed in accordance with § 413."

Section 413 (c) specifies a wide range of evidence that may be introduced at this proceeding, including evidence relating to any statutorily specified aggravating or mitigating circumstance.[14] At the sentencing proceeding, argument may be presented for or against a death sentence. § 413 (c) (2).

In determining the appropriate sentence, the sentencing authority — either the judge or jury — must first consider whether, beyond a reasonable doubt, any of ten statutory aggravating circumstances exist. § 413 (d).[15] If the

---

14. Section 413 (c) further permits the admission of:

"(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

15. Section 413 (d) specifies the following aggravating circumstances:

"(1) The victim was a law enforcement officer who was murdered while in the performance of his duties.

(2) The defendant committed the murder at a time when he was confined in any correctional institution.

(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer.

(4) The victim was a hostage taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct.

(5) The victim was a child abducted in violation of § 2 of this article.

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder.

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life.

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident.

(10) The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree."

sentencing authority does not find beyond a reasonable doubt the existence of one or more of the aggravating circumstances, then the sentence shall be life imprisonment. § 413 (f). If, however, the sentencing authority finds beyond a reasonable doubt the existence of one or more aggravating factors, then it must determine whether, by a preponderance of the evidence, any one of eight mitigating circumstances exist. § 413 (g).[16] The statute requires that a sentence of life imprisonment be imposed if, by a preponderance of the evidence, the sentencing authority finds that the mitigating circumstances outweigh the aggravating circumstances. § 413 (h) (1) and (3). If the mitigating circumstances do not outweigh the aggravating circumstances by a preponderance of the evidence, however, then a sentence of death must be imposed. § 413 (h) (1) and (2). The sentencing authority's decision must be in writing, and if the decision is made by a jury, it must be unanimous

---

16. The following mitigating circumstances are specified in § 413 (g):

"(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence. As used in this paragraph, 'crime of violence' means abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.

(2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.

(3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication.

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case."

and signed by the foreman. § 413 (i).[17] Under § 413 (k), the trial court is required to impose the sentence determined by the sentencing authority. If, however, the jury is unable to agree upon a sentence within a reasonable amount of time, the court must dismiss the jury and impose a sentence of life imprisonment. § 413 (k) (2).

Section 413 (l) further provides that the Court of Appeals may adopt rules of procedure to govern the conduct of the sentencing proceeding. Pursuant to this provision, we adopted Maryland Rule 772A, effective January 1, 1979 (eighteen days prior to the murder in this case). The rule imposes three major requirements, the first of which is the use of a standard form verdict sheet. As formulated in the rule, the sentencing authority must specify in writing whether each aggravating or mitigating circumstance was established by the degree of proof mandated by § 413. Rule 772A e further requires the trial court to advise the defendant of his right to appeal. Finally, subsection (f) of the rule obligates the trial court to prepare an extensive report in every case where the death penalty is sought, whether or not it is imposed. The report, which must be submitted to us under the rule, is designed to provide detailed information concerning the defendant, the offense, the victim, and the circumstances of the trial. In instances when a sentence of death is imposed, the trial judge must state his opinion whether the sentence was justified. The factual accuracy of the trial judge's report may be commented on by the parties within five days after receiving it.

Provision is made in the statute for expedited review by

---

17. Under § 413 (j), the determination by the sentencing authority must specify the following information:
"(1) Which, if any, aggravating circumstances it finds to exist;
(2) Which, if any, mitigating circumstances it finds to exist;
(3) Whether any mitigating circumstances found under subsection (g) outweigh the aggravating circumstances found under subsection (d);
(4) Whether the aggravating circumstances found under subsection (d) are not outweighed by mitigating circumstances under subsection (g); and
(5) The sentence, determined in accordance with subsection (f) or (h)."

this Court of the appropriateness of the death sentence in the circumstances of the case. § 414 (a) and (b). In addition to our consideration of any errors properly before us on appeal, § 414 (e) directs that in the course of our review of the sentence on the record, we must determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413 (d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Under § 414 (f) (2), we are directed to include in our decision a reference to the "similar cases" that we considered. We are obliged by the statute to exercise one of three options: (1) affirm the death sentence, or (2) set aside the sentence and remand the case for the conduct of a new sentencing proceeding, or (3) set aside the sentence and remand for modification of the sentence to life imprisonment. § 414 (f) (1) (i)-(iii).

We turn now to a consideration of the constitutionality of Maryland's capital sentencing statute. That it is not a mandatory death penalty statute is clear. Because it allows for a broad consideration of mitigating circumstances, it plainly withstands scrutiny under *Woodson v. North Carolina, supra,* and *Roberts v. Louisiana, supra.*[18] Furthermore, it is clear that the statute complies with the

---

**18.** In a later decision, the Supreme Court concluded that imposition of a mandatory death sentence for first degree murder of a police officer constituted cruel and unusual punishment. Roberts v. Louisiana, 431 U.S. 633, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977).

three general methods of guiding the discretion vested in the sentencing authority under *Gregg, Proffitt,* and *Jurek.* The statute provides a bifurcated trial procedure, and the imposition of the death penalty is limited to cases in which the sentencing authority finds at least one aggravating circumstance. The sentencing authority is required to consider the existence of mitigating circumstances. A sentence of death may be imposed only if the mitigating circumstances do not outweigh the aggravating circumstances. Although the sentencing authority still has discretion under the statute, it is guided by clear and objective standards. *See Gregg v. Georgia, supra,* 428 U.S. at 197-98.

Moreover, the statutory scheme incorporates the third major safeguard against arbitrariness, *i.e.,* the expedited automatic appeal of all death sentences to this Court. As indicated, we are enjoined by statute to review each sentence of death and determine whether it was arbitrarily imposed, whether the evidence supports the finding of the existence of an aggravating circumstance and whether it is not outweighed by mitigating circumstances and, finally, whether the sentence is disproportionate to sentences imposed in similar cases. In short, we hold that, on its face, the Maryland statutory scheme for imposition of the death penalty satisfies the requirements of the Eighth and Fourteenth Amendments to the federal constitution, and Art. 25 of the Maryland Declaration of Rights.

### (B)

Tichnell next maintains that § 413 violates due process by reason of the standards of proof required by the section, and by its allocation of the burdens of proof respecting the existence of mitigating circumstances and the balancing of mitigating and aggravating circumstances. He argues that sentencing determinations under § 413 must be made on the basis of proof beyond a reasonable doubt, not on the basis of a preponderance of the evidence. Tichnell's position is supported by an amicus brief filed by the Public Defender.

Relying on *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25
L. Ed. 2d 368 (1970), and *Mullaney v. Wilbur,* 421 U.S. 684,
95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975), it is suggested that
due process requires the prosecution to assume the burden of
proving beyond a reasonable doubt the absence of any
mitigating circumstances enumerated in § 413 (g) that are
raised by the accused in the penalty phase of trial. It is
contended that due process also requires the State to assume
the burden of proving beyond a reasonable doubt that the
aggravating circumstances outweigh the mitigating
circumstances.

Section 413 does not explicitly specify which party has the
burden of producing evidence and the burden of persuasion.
Instead, § 413 speaks in terms of requiring the sentencing
authority to make findings that satisfy either the reasonable
doubt or the preponderance of evidence standard; the section
involves a three-step procedure. First, as a condition
precedent to the imposition of the death penalty, the
sentencing authority must find beyond a reasonable doubt
that at least one aggravating circumstance has been proved.
§ 413 (f). As to this, the State bears both the risk of
nonproduction and nonpersuasion. The second step requires
that the sentencing authority consider whether, by a
preponderance of the evidence, a mitigating circumstance
exists. § 413 (g). This provision does not require the
prosecution to disprove the existence of mitigation, thus
placing on the accused the risk of nonproduction and
nonpersuasion. Finally, if the sentencing authority finds, by
a preponderance of the evidence, that the mitigating
circumstances do not outweigh the aggravating
circumstances, the death penalty must be imposed. § 413 (h)
(2). Because the State is attempting to establish that the
imposition of the death penalty is an appropriate sentence,
the statute places the risk of nonpersuasion on the
prosecution with respect to whether the aggravating factors
outweigh the mitigating factors.

We find nothing in *Winship* and *Mullaney* to justify
Tichnell's due process argument. In *Winship,* the Supreme

Court invalidated a procedure which, in the adjudicatory stage of juvenile delinquency proceedings, required the prosecution to prove delinquency, but only by a preponderance of the evidence. The Court noted that:

> " 'There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value — as a criminal defendant his liberty — this margin of error is reduced as to him by the process of placing on the other party the burden of * * * persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of * * * convincing the factfinder of his guilt.' " 397 U.S. at 364.

The reasonable doubt standard was referred to in *Winship* as a "prime instrument for reducing the risk of *convictions* resting on factual error," while the due process clause was said to protect the accused "against *conviction* except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Id. at 363-64 (emphasis added).

*Mullaney* invalidated a Maine statute which required the defendant to prove by a preponderance of the evidence provocation as a defense to murder in order to reduce the offense to manslaughter. The Court held that the due process clause requires the prosecution to prove beyond a reasonable doubt the absence of provocation when the issue is properly raised in a homicide case.

Tichnell argues that the rationale of *Winship* and *Mullaney* is applicable to the death sentencing procedure in § 413, and consequently no burden may be imposed on him to establish circumstances sufficient to avoid the imposition of the death penalty. We disagree.

The principles articulated in *Winship,* and in *Mullaney,*

as later modified in *Patterson v. New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 281 (1977), do not require the prosecution to either prove beyond a reasonable doubt the absence of mitigating circumstances, or to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.

In *Patterson,* the Supreme Court held that the defendant's conviction of murder did not violate the due process clause by requiring that he prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance in order to reduce the offense to manslaughter. The Court rejected the argument that this defense was indistinguishable from the provocation defense raised in *Mullaney.* The Court relied on the line of cases approving placement of the burden of persuasion of insanity on the defendant. *See Leland v. Oregon,* 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952). It said:

> "Among other things, it is normally 'within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion,' and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" 432 U.S. at 201-02.

The Court further noted that:

> "To recognize at all a mitigating circumstance does not require the State to prove its non-existence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate.
>
> "We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses

related to the culpability of an accused. Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch." *Id.* at 209-10.

We think that the burdens of persuasion as specified in § 413 are in accordance with the principles articulated in *Patterson.*

Additional support for the constitutionality of Maryland's capital sentencing determinations is found in *Gregg, Proffitt* and *Jurek.* In these decisions the statutory schemes that were upheld under the Eighth and Fourteenth Amendments to the federal constitution did not require the prosecution to prove the absence of mitigating circumstances beyond a reasonable doubt. It is also noteworthy that except for the statutory scheme considered in *Proffitt,* the statutes considered in these cases did not explicitly require that the sentencing authority find that the aggravating circumstances outweighed the mitigating circumstances prior to imposing a sentence of death. The *Proffitt* scheme, however, did not specify either a preponderance or a reasonable doubt standard for this determination. The other statutes, considered in *Gregg* and *Jurek,* did not expressly call for a balancing process; instead, they merely required that mitigating circumstances "be considered" if the sentencing authority found that the existence of aggravating circumstances was proven beyond a reasonable doubt. The Maryland sentencing determinations specified in § 413 plainly withstand scrutiny under *Gregg, Proffitt* and *Jurek.*

Other jurisdictions that have considered the burdens of persuasion under a statutory scheme similar to § 413 have held that due process does not require the State to prove beyond a reasonable doubt the absence of mitigating circumstances. *See, e.g., State v. Watson,* 120 Ariz. 441, 586 P.2d 1253, 1258-259 (1978), *cert. denied,* 440 U.S. 924, 99 S. Ct. 1254, 59 L. Ed. 2d 478 (1979); *State v. Pierre,* 572 P.2d

1338, 1346-348 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S. Ct. 219, 58 L. Ed. 2d 194 (1978); *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510, 543-44 (1979); *State v. Johnson,* 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979). The statutory scheme of § 413, in short, complies with the requirements of the due process clause of the federal constitution.

(C)

On January 18, 1979, the date of Tichnell's offenses, the Maryland capital penalty statute existed in its present form with one exception. Subsection (g) (8) was added to § 413 by ch. 521 of the Acts of 1979 and became effective on July 1, 1979, two months before Tichnell's trial. It directs the sentencing authority to consider: "Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." This provision was added to § 413 after the Supreme Court's decision in *Lockett v. Ohio,* 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), a case in which the Ohio death penalty statute was invalidated because it too narrowly limited the discretion of the sentencing authority to consider mitigating circumstances. The plurality in *Lockett* concluded that the Eighth and Fourteenth Amendments require

"that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis in original).

It is contended that the death sentencing procedure under § 413 in effect at the time the murder was committed was unconstitutional under *Lockett* because the subsequent prosecution of Tichnell under the amended version of § 413,

which cured the previous infirmities, violated the *ex post facto* clause of the Maryland Declaration of Rights.[19]

Assuming without deciding that § 413, without the addition of subsection (g) (8), was unconstitutional under *Lockett,* the 1979 amendment did not violate the *ex post facto* clauses of the state and federal constitutions. The Supreme Court in *Dobbert v. Florida,* 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977), considered a death penalty statute that had been amended between the time of the offense and the time of the trial, and decided that the change did not constitute an *ex post facto* violation. In that case, the trial judge, acting pursuant to statutory authority, overruled the jury's recommendation that the defendant be sentenced to life imprisonment, and imposed a sentence of death. The Supreme Court held that the new statute in effect at the time of trial, which gave the jury only the right of an advisory determination, did not constitute an *ex post facto* violation when the pre-*Furman* statute in effect at the time the offenses were committed required the imposition of the death penalty unless the jury recommended mercy. In defining the characteristics of an *ex post facto* law, the Court noted

> " 'that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto.*' " 432 U.S. at 292.

The Court found no *ex post facto* violation because it held that the changes in the statute were only procedural and ameliorative. Responding to the argument of the defendant

---

**19.** Article 17 provides:
"That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required."

that no valid death penalty statute was in effect at the time the crime was committed, the Court stated:

"[T]his sophistic argument mocks the substance of the *Ex Post Facto* Clause. Whether or not the old statute would, in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

". . . Here the existence of the statute served as an 'operative fact' to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution." 432 U.S. at 297-98.

Although it is undisputed that *Dobbert* renders meritless an argument based on the federal *ex post facto* clause, the argument is nevertheless made that the Maryland prohibition on *ex post facto* laws is applicable. Article 17 of the Maryland Declaration of Rights parallels the federal clause, *see Calder v. Ball,* 3 Dall. 386, 389, 1 L. Ed. 648, 650 (1798); *Elliott v. Elliott,* 38 Md. 357, 362 (1873); *Lynn v. State,* 84 Md. 67, 78, 35 A. 21 (1896),[20] and the Supreme Court's interpretation of the federal *ex post facto* clause is persuasive authority.

---

**20.** In construing Virginia's legislatively enacted *"ex post facto* clause," the Virginia Supreme Court viewed *Dobbert* as authority to uphold a death sentence for a crime committed before the effective date of the state death penalty statute. Smith v. Commonwealth, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967, 99 S. Ct. 2419, 60 L. Ed. 2d 1074 (1979). *Contra,* Miller v. State, 584 S.W.2d 758 (Tenn. 1979) (state constitutional prohibition against *ex post facto* laws invalidated the death sentence when the defendant committed the crime at a time the Tennessee death penalty statute was unconstitutional).

The change in § 413 by the addition of subsection (g) (8) was clearly procedural. In the words of *Dobbert*:

> "The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." 432 U.S. at 293-94.

Furthermore, assuming that the addition of subsection (g) (8) was necessary to comply with *Lockett,* the change did not make the statute more onerous, but instead afforded the defendant significant new safeguards. Moreover, we repeat the observation of the Supreme Court in *Dobbert* that the defendant had fair warning as to the degree of culpability which Maryland ascribes to the act of murder. We think it clear that Article 17 of the Maryland Declaration of Rights was not violated in this case.

### (D)

It is next contended that Article 23 of the Maryland Declaration of Rights permits a jury to reach arbitrary sentencing decisions in violation of the constitutional requirements of *Gregg v. Georgia, supra.* Article 23 provides in pertinent part:

> "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction."

Maryland Rule 757 b implements this constitutional provision and requires:

> "In every case in which instructions are given to the jury the court shall instruct the jury that they are the judges of the law and that the court's instructions are advisory only."

It is argued that counsel may as a matter of right argue to the jury a position contrary to the court's instructions, *see*

*Dillon v. State,* 277 Md. 571, 581, 357 A.2d 360 (1976); *Wilson v. State,* 239 Md. 245, 255, 210 A.2d 824 (1965); *Schanker v. State,* 208 Md. 15, 21-22, 116 A.2d 363 (1955), and consequently the jury is unconstitutionally made the final arbiter as to the law governing the imposition of the death penalty. Because the jury is told that it is the judge of the law, the contention is advanced that there is no way to ensure compliance with the safeguards placed on the sentencer's discretion by § 413.

The short answer to this argument is that a claim based on Article 23 is not presented by this case. As permitted by § 413 (b) (3), Tichnell waived his right to a jury determination of sentence and elected to have the judge make the decision. Although in making his election, Tichnell expressed concern that the jury would improperly consider inflammatory evidence presented at the guilt stage of his trial, there is no suggestion in the record that the waiver was prompted by a fear that Article 23 vests the jury with the power to disregard the statutory sentencing criteria. Thus, the facts of this case do not present a claim based on Article 23.

### (E)

Section 414 (e) requires that, in reviewing the death sentence imposed upon Tichnell, we determine (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the sentencer's finding of a statutory aggravating circumstance; (3) whether the evidence supports the sentencer's finding that aggravating circumstances outweigh mitigating circumstances; and finally

"(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Section 414 (e) appears to be patterned after the appellate review provision of the Georgia death penalty statute approved in *Gregg v. Georgia, supra,* 428 U.S. 153 (1976).[21] In that case, the Supreme Court noted that the appellate review provision of the Georgia capital-sentencing scheme functions as a check against the arbitrary imposition of the death penalty. *Id.* at 206.

Given the identity of language and purpose of the proportionality provision of § 414 (e) (4) and the sentence review provision approved in *Gregg,* the Georgia provision may be utilized as a guideline for our review determinations. The proportionality review provision (also referred to as the comparative review clause), as interpreted by the Georgia Supreme Court, requires the setting aside of a death sentence as excessive if it is " 'rarely imposed for an act or it is substantially out of line with sentences imposed for other acts.' " *Coley v. State,* 231 Ga. 829, 204 S.E.2d 612, 616 (1974). Under this provision, the Georgia Supreme Court has held that a death sentence in a murder case may be affirmed only if juries generally throughout the state have imposed the death penalty for that kind of offense. *Jarrell v. State,* 234 Ga. 410, 216 S.E.2d 258, 270 (1975). As summarized in *Gregg,* the proportionality review provision of the Georgia statute

> "substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind

---

21. In considering the appropriateness of a death sentence, the Supreme Court of Georgia is directed to consider:

 " '(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
 '(2) Whether . . . the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . ., and
 '(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' " 428 U.S. at 167-68.

The identical language appears in § 414 (e). The only significant difference between the two provisions is that § 414 (e) contains an additional determination in paragraph (3).

of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." 428 U.S. at 206.

Further insight into the purpose and constitutional necessity of the provisions of § 414 (e) may be gained by examining the appellate review procedures upheld in *Proffitt v. Florida, supra,* 428 U.S. at 242, and in *Jurek v. Texas, supra,* 428 U.S. 262. These decisions reveal that the absence of a specific provision for proportionality review, as found in § 414 (e) (4), will not render a death penalty statute constitutionally infirm. *Proffitt* noted that while the Florida statute contained no express provision for proportionality review, the Florida Supreme Court considers its review function to be similar to that of the Georgia Supreme Court, namely, to

"'[guarantee] that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case. . . . If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great.'" 428 U.S. at 251, *citing State v. Dixon,* 283 So. 2d 1, 10 (Fla. 1973).

The Texas statute upheld in *Jurek v. Texas, supra,* 428 U.S. 262, provided for an automatic appeal, but also lacked an express provision for proportionality review. The Court nevertheless assumed that death sentences were subject to this type of review, stating:

"By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be

'wantonly' or 'freakishly' imposed, it does not violate the Constitution." 428 U.S. at 276.

The essential principle underlying the varieties of proportionality review upheld in *Gregg, Proffitt,* and *Jurek* is, in short, the guarantee that death sentences will be imposed in a reasonably consistent manner. *See People v. Frierson,* 158 Cal. Rptr. 281, 599 P.2d 587, 610 (1979).

With these principles in mind, the question arises as to how we are to determine under § 414 (e) (4) whether Tichnell's sentence "is excessive or disproportionate to the penalty imposed in *similar cases,* considering both the crime and the defendant." (Emphasis supplied.) Because this is the first case to reach us for review under the 1978 death penalty statute, we are presented with an apparent dilemma of how to proceed with a comparative review of similar cases. On the one hand, if we, out of necessity for finding a similar case, compare Tichnell's sentence with cases decided under the constitutionally infirm pre-*Furman* and pre-*Gregg* statutes, we thereby use as the basis of our comparison cases in which life sentences may have been imposed if they had been decided under the present statute. Cases tried under previous Maryland statutes gave the sentencing authority unbridled discretion in deciding whether life imprisonment or death was the appropriate punishment. The other horn of the dilemma is that if no similar cases exist under either the present or past statutes, then it is impossible to complete the review mandated by § 414 (e) (4).

There are several ways to avoid the conclusion that the comparative sentence review mandated by § 414 (e) (4) can never be implemented. The first approach, sanctioned in *Gregg,* is to cautiously employ pre-*Furman* cases in the comparative review examination. That case recognized that this practice was a matter of necessity at the inception of a new sentencing procedure. 428 U.S. at 204 n. 56. Several states have followed this approach. *See Jacobs v. State,* 361 So. 2d 640, 644-45 (Ala. 1978), *cert. denied,* 439 U.S. 1122, 99 S. Ct. 1034, 59 L. Ed. 2d 83 (1979); *Ross v. State,* 233 Ga. 361, 211 S.E.2d 356, 360 (1974); *Deutscher v. State,* 601 P.2d

407, 419 (Nev. 1979); *Bell v. State,* Miss., 360 So. 2d 1206, 1214 (1978), *cert. denied,* 440 U.S. 950, 99 S. Ct. 1433, 59 L. Ed. 2d 640 (1979); *Smith v. Com.,* 219 Va. 455, 248 S.E.2d 135, 151 (1978), *cert. denied,* 441 U.S. 967, 99 S. Ct. 2419, 60 L. Ed. 2d 1074 (1979). Other states have restricted the scope of comparison to cases decided under constitutionally approved death penalty statutes. *See Collins v. State,* 261 Ark. 195, 548 S.W.2d 106, 122, *cert. denied,* 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158 (1977); *State v. White,* 395 A.2d 1082, 1095-96 (Del. Supr. 1978); *State v. Martin,* 376 So. 2d 300, 312-13 (La. 1979); *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, 890, *cert. denied,* 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158 (1977); *State v. Shaw,* S.C., 255 S.E.2d 799, 807 (1979), 444 U.S. 957, 100 S. Ct. 437, 62 L. Ed. 2d 329.[22] Furthermore, most states restrict their consideration of similar cases to cases decided under their own state law. *See, e.g., Collins v. State, supra,* 548 S.W.2d at 122; *State v. White, supra,* 395 A.2d at 1096; *Moore v. State,* 233 Ga. 861, 213 S.E.2d 829, 833 (1975), *cert. denied,* 428 U.S. 910, 96 S. Ct. 3222, 49 L. Ed. 2d 1218 (1976); *Deutscher v. State, supra,* 601 P.2d at 418; *State v. Shaw, supra,* 255 S.E.2d at 807; *Coppola v. Com.,* 220 Va. 243, 257

---

**22.** In Smith v. Com., *supra,* the Virginia Supreme Court recognized that capital cases tried under prior constitutionally defective statutes involved definitionally different offenses. In affirming a death sentence under the new 1977 statute, the court, nevertheless, apparently relied on a comparison drawn from death sentences imposed over the course of seven decades. 248 S.E.2d at 151. In Collins v. State, *supra,* the Supreme Court of Arkansas simply reviewed the evidence in the case and concluded that the aggravating circumstances outweighed the mitigating circumstances. In affirming the death sentence, the court stated that it was unable to find a similar case in which a death sentence was reduced to life imprisonment. 548 S.W.2d at 122. The Supreme Court of Nebraska found it useful to analyze the proportionality review question in terms of whether the court has been able to find a similar case in which a life sentence was imposed. If no such case is found, a death sentence is assumed to be appropriate. *See* State v. Williams, 205 Neb. 56, 287 N.W.2d 18, 29-30 (1979). The Supreme Court of Louisiana in State v. Martin, *supra,* simply reviewed the evidence, and even though no similar cases were referred to, found that the death sentence was not disproportionate to the penalty imposed in similar cases. 376 So. 2d at 313. In State v. Simants, *supra,* 250 N.W.2d at 894, one of the first decisions under the state's new death penalty statute, the Supreme Court of Nebraska reviewed and affirmed a death sentence in light of a comparison with cases decided under the same statute in which no similar cases were referred to.

S.E.2d 797 (1979). *Contra, Bell v. State, supra,* 360 So. 2d at 1214-15.[23]

An alternative approach to considering pre-*Furman* cases is simply to recognize that a system of review that requires a comparison with similar cases must have a beginning. *State v. Shaw, supra.* Under this approach, the reviewing court has recognized that the first case under the new statutory scheme cannot be compared to similar cases that have been decided under the statute. Under this view, the first case must stand by itself, otherwise comparative review would be impossible — a determination at odds with the presumption that a legislative body does not intend to enact an ineffective and inoperative statute. *See, e.g., Swarthmore Co. v. Kaestner,* 258 Md. 517, 525, 266 A.2d 341 (1970); *Welsh v. Kuntz,* 196 Md. 86, 98, 75 A.2d 343 (1950).

These difficult questions, as well as others which we do not here delineate, need not be reached in this case because, as Tichnell suggests, the death sentence was imposed upon him under the influence of an "arbitrary factor" in violation of § 414 (e) (1). He argues that in selecting Judge Pollitt, rather than the jury as the sentencing authority, he was prejudicially misled by a remark made by the trial judge. In commenting on the sentencing judge's report to this Court, as authorized by Rule 772A, Tichnell's counsel filed an affidavit which stated that during a trial recess prior to the completion of the evidence in the case, Judge Pollitt made the following in-chambers comment in his presence, and in the presence of the State's Attorney: "[H]e thought that the jury could in the case return a first degree murder verdict, but that 'I am not sure this is a death sentence case.' " The State's Attorney also filed an affidavit concerning the

---

23. Other jurisdictions have considered cases involving the murder of a police officer. *See* Holmes v. State, 374 So. 2d 944 (Fla. 1979) (death sentence affirmed despite defendant's lack of a criminal record). *See also* Cade v. State, Ala. Cr. App., 375 So. 2d 802, *aff'd* 375 So. 2d 828 (1979) (death sentence upheld, aggravating circumstances outweighed mitigating circumstances).

alleged comment, stating that Judge Pollitt "said in effect that he was not sure that the Jury would buy Tichnell's version, but wasn't sure that they would impose the death sentence or that it was a death sentence case." In his affidavit, the State's Attorney said that the comment "in no way, inferred *to the State's Attorney* Judge Pollitt's personal feelings, if any, concerning the case." (Emphasis supplied.) Judge Pollitt, in a letter to Tichnell's counsel, included in the record, stated that he remembered his in-chambers comment, but that it did not indicate "any feeling of mine as to whether the death sentence would be appropriate in this case." Instead, he said, "I very probably stated in casual conversation that I was not sure that a jury would be able to agree on a death sentence, since I had previously experienced such inability to agree, in a case equally as serious."

It is, of course, impossible for us to know whether Tichnell's waiver of a jury determination of sentencing was actually based on a belief, generated by Judge Pollitt's remark, that he would not impose the death sentence if he was the sentencing authority. Tichnell claims that he was advised of Judge Pollitt's remark and was influenced by it in selecting him as the sentencing authority. The affidavit of the State's Attorney attesting to the words said by Judge Pollitt supports, rather than detracts, from Tichnell's version of the import of the remark. At the least, the remark was ambiguous and subject to the impression that Judge Pollitt did not think that the case was one which deserved the death penalty. Notwithstanding Judge Pollitt's contrary recollection of what he said, we think, in the circumstances, the imposition of the death sentence was influenced by an "arbitrary factor" under § 414 (e) (1), requiring that it be set aside and the case remanded for a new sentencing proceeding under § 413. Tichnell may, at the resentencing hearing, exercise the options available to him under § 413 and elect either a jury or a judge as the sentencing authority. Should he choose the latter, a judge

other than Judge Pollitt should preside, if Tichnell so requests.[24]

> *Judgments affirmed, except as to the imposition of the death sentence; death sentence vacated and case remanded to the Circuit Court for Wicomico County for a new sentencing proceeding under § 413 of Art. 27; each party to pay own costs.*

*Cole, J., concurring:*

I concur in the result, there being, in my opinion, no necessity to reach the constitutional issues in the case.

*Davidson, J., concurring:*

I concur in the result.

---

**24.** In the post-sentence report required to be filed by the trial judge under Rule 772A, Judge Pollitt indicated that according to a Fairmont, West Virginia police report, Tichnell said on November 3, 1977 "that he would 'kill a cop' the next time arrested." Tichnell disputed the authenticity of this notation on the police report and his position was supported by an affidavit of the Police Chief of Fairmont. At Tichnell's resentencing hearing, the State may, if it wishes, adduce any evidence "that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements." § 413 (c) (v) of Art. 27.