**STATE, Appellee, v. ROSS, Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 22511.   Decided July 7, 1952.

Frank T. Cullitan, County Pros., John J. Mahon, Gertrude M. Bauer, Asst. Pros. Attys., Cleveland, for appellee.

Wallace J, Baker, Lester J. Farber, Cleveland, for appellant.

564

(DOYLE, J, of the 9th District, sitting by designation in place of THOMPSON, J.)

### OPINION

By DOYLE, J:

On December 8, 1951, in the early afternoon, George F. Ross, in Cuyahoga County, Ohio, shot Forney Haas, and killed him without justification or excuse.

The victim of the assassin's bullets was a police officer of the City of Cleveland, Ohio, who, while patrolling on duty in a police car and in full uniform had his suspicions aroused by the defendant, who operated a large Lincoln automobile without a hood covering the motor, and which carried a California license plate. The suspect drove from Euclid Avenue on to Adelbert Road in the vicinity of Western Reserve University, and the officer there stopped him. In the course of the customary questioning, he was asked to produce his driver's license and identification material. In response, he said that his billfold containing his license had been stolen from his room, but that he had other identification papers there which he could show. Thereupon the officer ordered him to drive to his rooming house, and the policeman followed in the police car. After parking their respective cars in the rear of the rooming house, the defendant proceeded into the house through the front door, and the policeman walked behind. The officer, observing the landlady in the hallway, asked her if his temporary companion had reported a billfold stolen from his room. She replied in the negative. They then proceeded up a stairway leading to the second floor. The policeman followed several steps behind the roomer. As the defendant reached the landing of the floor above, he turned, drew a concealed revolver, and fired it into the body of the deceased. The landlady related in the trial that: she heard a shot and a body fall; she then saw a human form lying about two-thirds of the way up the stairs; she ran to the telephone to call for help; and in the meantime two more shots were fired.

The defendant, in relating the tragedy from the witness chair at the trial, spoke of his fear of arrest, and the consequential exposure of a series of violations of a parole awarded him from a California prison. He also feared the officer's discovery of a quantity of stolen property in his room, which was the accumulation of burglaries committed by him. He likewise knew that he had no driver's license, no license for the stolen Lincoln automobile, nor papers of identification which he had promised.

"Q. And when you reached the top step on the second floor

you turned; the officer was right behind you; he was facing you then, wasn't he?

"A. He was. * * *

"Q. * * * And you had in your mind, then, that you were going to escape, didn't you?

"A. Yes.

"Q. When you turned you pulled out a gun and pointed it at the officer, didn't you?

"A. I did.

"Q. And you fired a shot, didn't you?

"A. I did."

The witness continued with the statement that, before he fired the shot he told the officer to "raise his hands." The officer responded with the statement, "I thought so," and reached for his revolver.

"Q. What did you do then?

"A. I fired a shot—a warning shot to the side of him. * * *

"Q. And what happened after that?

"A. Then I told him again to raise his hands.

"Q. And what did he do or say?

"A. He continued to bring the gun to bear on me.

"Q. Yes, And then what happened?

"A. That, I don't know.

"Q. What is the next thing that you do know?

"A. I know that I was running down the stairs and he was in a crouching position with the gun in his hand, and as I ran by him I grabbed the gun out of his hand."

Continuing, the witness said that he saw his landlady at the telephone and he ordered her away. He then proceeded on his flight from the scene of his killing. He testified that, after he fled from the house, he examined his gun "to see actually how many shots had been fired" and "found that three bullets had been fired."

The fact was established that at least two bullets entered the body of the deceased—one in the left parietal region of the head and another through the left forearm and the left side of the abdomen. It is possible that the latter two wounds were caused by the same bullet. Be that as it may, death shortly followed.

On January 5, 1952, the defendant was indicted on two counts for murder in the first degree. The first count charged that he "unlawfully, purposely and of deliberate and premeditated malice killed Forney Haas." **Sec. 12400 GC.** The second count charged that he "unlawfully, purposely and wilfully killed Forney Haas, a duly appointed, qualified and acting policeman of the city of Cleveland, Cuyahoga County,

Ohio, while said Forney Haas was in the discharge of his duties as a policeman." **Sec. 12402-1 GC.**

On January 7, 1952, the defendant was arraigned, and he pleaded not guilty. On January 14, 1952, at the request of the defense, psychiatrists were appointed to examine into the present sanity of the accused, and on January 24, 1952, upon hearing on the issue of sanity or insanity, he was found to be presently sane. A plea of not guilty by reason of insanity was then entered of record.

On February 4, 1952, upon the issues thus joined, trial was had to a jury, and, at the conclusion thereof, a verdict was rendered finding the defendant guilty on each of the counts in the indictment of murder in the first degree. A recommendation of mercy was not given. Following the overruling of a motion for a new trial, sentence was duly pronounced and recorded, to death in the electric chair.

It is asserted in the appeal to this court that many errors committed in the trial of the case deprived the accused of a fair trial. We are asked to reverse the judgment and remand the cause for a new trial. We will state some of the errors claimed and will examine and rule upon them all.

It is a substantial right of the defendant to a fair trial. This right is not the abstract question of guilt or innocence. A guilty man is entitled to a trial, free from prejudicial error. We must, therefore, give careful heed to the various claims, without regard to the convincing character of the State's case.

It is claimed:

"1. The trial court failed and refused to charge properly in connection with the statutes describing the duties of a police officer, to-wit, **O. G. C. (Ohio General Code) 12402-1** and **O. G. C. 4378."**

The theory of the defense is that the police officer, when he received the mortal wounds, was not "in the discharge of his duties," and therefore a conviction under the second count in the indictment cannot be supported. **Sec. 12402-1 GC,** so far as pertinent, is as follows:

"Whoever purposely and wilfully kills a * * * policeman * * * while such * * * policeman * * * is **in discharge of his duties,** is guilty of murder in the first degree and shall be punished by death unless the jury trying the accused person recommend mercy, in which case the punishment shall be imprisonment in the penitentiary during life." (Emphasis ours.)

The argument is made that the officer, in not **obeying** the laws of the state or the rules of the police department, was not in the discharge of his duties when killed.

**Sec. 4378 GC** provides in part:

"The police force shall preserve the peace, protect persons and property and obey and enforce all ordinances of council and all criminal laws of the state and the United States."

The disobedience of the officer is asserted to be that: 1. When he arrested the defendant without a warrant he failed, "without unnecessary delay," to "take the person arrested before a court or magistrate having jurisdiction of the offense" and "make or cause to be made before such court or magistrate a complaint stating the offense for which the person was arrested," contrary to §13432-3 GC; (2) he violated rule 183 of the police department which is "when persons are taken into custody, they shall be transported to the station by the most direct route"; (3) he failed to notify a detective, in violation of rule 225 of the department, which reads, "A detective shall be immediately notified after the arrest of any person for felony or for investigation of a felony."

Whether the officer arrested the accused as a suspicious person or for a traffic violation will never be definitely known, unless full credence be given to the statements of the defendant. The officer's lips have been forever sealed, and he was the only other person to know. It may well be that no arrest was made, and each person voluntarily proceeded to the rooming house. At any rate, it was the duty of the police officer to "preserve the peace," and, in doing so, his duties permitted and required him to arrest suspicious persons on a charge of suspicion with or without a warrant and to make such reasonable investigation as would be necessary to establish or refute the charge.

The statutes and rules relied upon by the defense are not mandatory in the sense that they must be literally obeyed to the exclusion of all ordinary routine work of a peace officer. The evidence establishes without contradiction that the officer went to the rooming house for no other purpose than to fulfill his duties as a peace officer in the act of preserving the peace by investigation. His duties required him to act promptly to preserve such evidence for or against the person suspected. Delay could have vitally affected the peace of the community through destruction or concealment of material evidence.

We are of the opinion that no reasonable mind could conclude otherwise than that, whether the officer technically violated the rules relied upon by the defendant or not, nevertheless, he was acting in line of duty as well as in the discharge of his duties when he was killed. It would seem that

the statutes and rules are directory, or declaratory of a procedure, rather than mandatory, although a ruling on this question is unnecessary. In construing the legislative meaning of the words "in discharge of his duties," as used in §12402-1 GC (murder statute), we are not at liberty to depart from the words employed; but we are bound to ascertain the fair meaning of those words, in view of the sense in which they are used.

In respect to alleged error No. 1, we find the claim untenable. The trial court properly rejected the theory of the defense as reflected in the various requests to charge the jury, and did properly charge the jury on the subject matter in controversy.

"2. Wrongful admission of evidence as to unrelated crimes."

The State proved in its case in chief that the defendant, between the time of his arrival in Cleveland on December 3, 1951, and December 8, 1951, the date of the homocide, had perpetrated two separate burglaries of inhabited dwelling houses in the County of Cuyahoga. In one of the burglaries he made his escape from the burglarized home after drawing a gun on the occupant. Property stolen while perpetrating these crimes was found in his room after the killing of the officer and was admitted in evidence.

Fundamental has been the rule that character is never an issue in a criminal prosecution, unless the defendant chooses to make it one. The law has set its face against the endeavor to fasten guilt upon an accused person by proof of character or experience predisposing to an act of crime. The State may not prove generally against a defendant crimes not alleged in the indictment, committed on other occasions than the crime alleged in the indictment. See **12 O. Jur., Criminal Law, Sec. 321, p. 333** and cases therein cited. This rule of exclusion, however, is subject to several notable exceptions. Such proof is competent if it tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. These exceptions are stated generally, not with categorical precision, and may not be all-inclusive. This State has also enacted the following statute, which has adopted and extended somewhat the general rules of evidence:

"In any criminal case where the defendant's motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any

like acts or other acts of the defendant which may tend to show his motive, intent, the absence of mistake or accident on his part, or the defendant's scheme, plan or system in doing the act in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another or subsequent crime by the defendant."

Sec. 13444-19 GC.

A different question might be here if the possession of the stolen property by the defendant through his burglaries, had no bearing upon the motive of the defendant in fleeing from the officer and in shooting him to make his flight effective. It is reasonable to conclude that the defendant was satisfied that, once they entered his room, his previous criminal conduct would be brought to light, and he would be held to answer to the law. It appears that the motive for escape is so definite that it needs no further statement. The fact that the evidence tends to prove other distinct crimes does not render it inadmissible. The defendant's own conduct established this part of the history of the case, and he cannot be heard to complain. The competency of the evidence once established, the State was entitled to prove the elements constituting the several crimes. **Shelton v. State, 106 Oh St 243.**

"3. The court erred in admitting evidence in detail of the acts of the defendant-appellant in flight."

The State proved that the flight of the defendant after the homocide, took him to Bedford, Ohio, where he stole an automobile. He drove this stolen car to West Virginia, where he burglarized a home. He then abandoned the car stolen in Bedford and stole another one which he drove to a place in the vicinity of Fairmont, West Virginia. He attempted there to burglarize a store and gasoline station, but his activities sensitized a burglar alarm, which aroused the owners. A shooting affray followed between the owners and the defendant, after which the defendant escaped, and, in so doing, he dropped the revolver which he had taken from the body of his Cleveland victim. He also abandoned the car which he stole in West Virginia. The dropped revolver was later found and identified. The defendant then returned to Fairmont, West Virginia, where he repossessed the Bedford, Ohio, car which he had abandoned, and continued his flight to Ellicot City, Maryland. In the Maryland city he was found sleeping in the car by police. Upon being aroused he again engaged in gun fire. His antagonist on this occasion was the Ellicot City Chief of Police. Following his escape from this point in his flight, after an intensive manhunt by officials of many

kinds, he was eventually arrested and returned to Cleveland. At the time of the arrest he was armed with a loaded revolver.

This evidence was established by direct testimony, admissions and confessions. It was corroborated in practically its entirety by the testimony of the defendant when he testified on his own behalf in the trial.

The appellant states his claim of error as follows:

"It is axiomatic that evidence of acts committed subsequent to the crime charged is inadmissible unless such evidence aids the jury in determining the guilt of the defendant * * *. Cases cited in the text books indicate that evidence of flight is admissible where the defendant has denied the commission of the offense or has set up an alibi or made some other appropriate defense, but, in this case, neither defendant nor his counsel at any time in the trial denied that he was the party involved in the shooting of the officer. We submit, therefore, that the evidence of his conduct following December 8, 1951, when the shooting took place, was introduced only for one purpose—that of prejudicing the jury."

From the foregoing statement, it would seem that the defendant believes that he was being tried only for the shooting of a policeman. Of course, this was not the offense charged by the State. The offense charged in the indictment was the **first degree murder** of a policeman, and at no time in the trial of the case was there an admission of a murder of this vicious type. The defendant throughout the trial stood firmly on his plea.

"Flight from justice, and its analogous conduct, have always been deemed indicative of a consciousness of guilt. * * * It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt * * *." II Wigmore on Evidence (Third Ed.) Sec. 276 and cases cited.

"* * * Flight does not raise a presumption of guilt. It is merely a circumstance which the jury may consider in connection with other facts in evidence. It tends to show a consciousness of guilt, or a guilty connection with the crime. * * *" **12 O. Jur., Criminal Law, Sec. 313, p. 320**, and cases cited.

The fact that different crimes were committed by the defendant in his flight became an integral part of the history of the case, and became an inseparable part of the flight. It is fair to infer that the separate burglaries and larcenies were perpetrated to secure money or property to finance and accomplish further flight, and to avoid apprehension for the

Cleveland killing. They, therefore, became an inseparable part of the whole.

In addition, as heretofore stated, the defendant himself voluntarily undertook to relate from the witness stand the circumstances, concerning the introduction of which, in the State's case in chief, complaint is now made. The proof offered by the State merely darkened and reddened that which was black enough and red enough when painted by the defendant's own brush.

In the light of the court's caution to the jury of the only purpose for which proof of other crimes may be considered, we find no error of a prejudicial nature under this claim.

"4. Wrongful admission of voluntary statement of defendant-appellant not relating to crime contained in the indictment."

It appears that, after the apprehension of the defendant, he was interrogated by police officers of West Virginia relative to his activities in that State during his flight. He voluntarily made a detailed disclosure of his conduct there, which in general corroborated the testimony of other witnesses.

The competency of this evidence has been heretofore discussed in this opinion. Further statement on this question need not be here made except to say that the fact that it was cumulative did not render it inadmissible, nor was its admission prejudicial to the defendant's rights.

"5. The court erred in his charge to the jury on the question of premeditation and deliberation."

As heretofore stated, the first count in the indictment charged that the defendant "unlawfully, purposely and of deliberate and premeditated malice killed Forney Haas." One of the necessary elements under this count, as distinguished from the second count, was proof beyond a reasonable doubt of deliberation and premeditation; and, of course, it was necessary to a fair trial, that the jury be properly instructed on this subject. (Under the second count, proof of deliberation and premeditation was unnecessary for conviction.)

The part of the court's charge to which complaint is here made is as follows:

"It not only must be purposely or intentionally done, and I am referring to the killing now, it must be with deliberate and premeditated malice. That is really one sentence, but I will speak of deliberation and premeditation first, and then a word on malice. Deliberation and premeditation, in law, means to think before one acts, to consider, to ponder, to do some turning over in the mental process. The law fixes no time within which premeditation and deliberation must be

had. It can continue for months or weeks or days or hours, and, on the other hand, it can be the shortest possible period of time, and that time can be a matter of seconds, if the situation is such as to enable a person under the circumstances, whatever they were, in the particular case, to turn over and to plan and to execute in pursuance of the plan a realization of what one is about to do and the consequence of doing is sufficient."

At the trial the vital question, on the first count in the indictment, was the defendant's state of mind at the moment of the homocide. Did he shoot with deliberate and premeditated design to kill? When he was first accosted, did he lure the police officer to his rooming house by trick so that he could kill him with his concealed weapon, if it was necessary to accomplish an escape? Did he have this intent and purpose from the beginning, or, although knowing the nature of his act—the shooting—and the reasonable consequences thereof, was he the prey to sudden impulse—the frantic overmastering agitation of the fleeting moment?

These and like questions the jurors were to ask themselves and answer before measuring the defendant's guilt under this count in the indictment, the count requiring proof of deliberation and premeditation.

In addition to the part of the court's charge heretofore quoted, the court properly said, "So, on the first count of this indictment, if you find that George Ross purposely and of premeditated and deliberate malice killed Forney Haas in Cuyahoga County he is guilty of murder in the first degree. **If any one of those elements is missing, he is not to be found guilty of murder in the first degree on that count."** (Emphasis ours.)

The argument is made by the defendant that "While it is correct to charge that deliberation and premeditation are not required to continue longer than a moment, it is error to say that they may occur in a moment." We are cited to the case of **Tolliver v. State, 9 Abs 488.**

It has been the law of this State for more than one hundred years, that if a person has actually formed the purpose to maliciously kill another, and deliberated and premeditated upon it before he performed the act of killing, he is guilty of murder in the first degree, however short the time may have been between the purpose and the execution. It is not the time of deliberation and premeditation that is requisite, but the actual existence of the purpose, malice, deliberation and premeditation, and it matters not how short the time, if the party has actually turned it over in his mind, weighed and

deliberated upon it. "* * * it would seem to make no difference whether the deliberation was in forming the design maliciously to kill, or, in the continuance of such design after being formed, until the same was executed." **Shoemaker v. State, 12 Ohio 43,** at **p. 53.** Patterson's Criminal Code (3rd Ed.) 588, et seq.

It is not the purpose of this Court to marshal support for the jury instructions condemned in Tollivar v. State, supra, and Burns v. State, 3 O. Dec. Rep. 122. In those cases the instructions advised the jury in what time deliberation and premeditation might take place. This was held to be error. It was not the province of the court to determine this question as a matter of law. On the other hand, if the jury should find as a fact that deliberation and premeditation was proved, then whether it existed for only a moment or longer would be of no particular importance. Early v. State, 16 O. C. C. 646.

In the light of the foregoing, did the Court meet its responsibility? The court said that "deliberation and premeditation * * * means to think over one's acts, to consider, to ponder, to do some turning over in the mental process. **The law fixes no time within which premeditation and deliberation must be had.**" (Emphasis ours.) Thus far the instructions follow the law of this State. Perhaps the trial judge would have used different language had he been charging a jury composed of professors of psychology, but his use of common, every-day terms adequately conveyed the thought to the jury of laymen.

The Court then continued by saying that premeditation and deliberation, "can continue for months or weeks or days or hours, and, on the other hand, it can be the shortest possible period of time, and that time can be a matter of seconds." This statement standing alone might be subject to question; however, it is qualified by and must be read as an integral part of "if the situation is such as to enable a person under the circumstances, whatever they were, in the particular case **to turn over and to plan and to execute in pursuance of the plan a realization of what one is about to do** * * *." (Emphasis ours.) The court has not said to the jury that deliberation and premeditation may occur in any specified length of time. On the contrary, it has said in short that, if the deliberation and premeditation has occurred, "it matters not how short the time (or as a matter of fact how long) if the party has actually turned it over in his mind." Shoemaker v. State, supra, at page 53.

We are of the opinion that the instructions are not tarred with the vice of the complaint and are not prejudicially erroneous.

"6. The trial court arbitrarily removed from the consideration of the jury all evidence as to sanity or insanity. of this defendant-appellant at the time of the commission of the offense."

The defendant, as noted before, created the issue of not guilty by reason of insanity. The trial court in consideration of the evidence did not submit this pleaded defense, and stated to the jury: "And you are, therefore, to proceed in this case to your findings on the assumption that Ross was sane at the time of those incidents, at that place at 8120 Euclid Avenue."

It is the contention of the defense that the mental and emotional qualities of the defendant were of such a level at the time of the crime that he was incapable of deliberation and premeditation—that he had an insane irresistible impluse to escape in any way possible from the police officer.

From the evidence of the psychiatrist for the defense, the jury was told that the defendant had a psychopathic personality, his moral activities were defective, he was emotionally unstable, although at the same time he was sane in the sense that he knew right from wrong. Other witnesses testified to the behavior of the defendant at various times and on various occasions.

By repeated adjudications in this State where the insanity of the accused is set up as a defense, the burden of establishing such defense by a preponderance of the evidence rests upon the defendant. The law presumes every person sane, and in a criminal case this presumption of sanity serves the State as the full equivalent of express proof until such time as it is made to appear by a preponderance of the evidence that the defendant was insane at the time of committing the crime alleged against him.

**Loeffner v. State, 10 Oh St 598; Bond v. State, 23 Oh St 349; Bergin v. State, 31 Oh St 111; Kelch v. State, 55 Oh St 146; State v. Austin, 71 Oh St 317; Long v. State, 109 Oh St 77.**

The defense asserts that there was evidence in the record tending to sustain the defense of insanity. The trial court said there was not.

"There is a distinct and definite place in our Anglo-American scheme of trial procedure for the exercise of the jury's function. The 'common touch' implicit in the laymen's non-technical approach to the decision of cases has been jealously guarded throughout our judicial history. But definite boundaries of the jury's province have always been recognized. The judge is to see that they are not transgressed." **Hamden Lodge v. Ohio Fuel Gas Co., 127 Oh St 469 at p. 482.**

In civil cases it is established that "5. Where from the evi-

dence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury," but on the other hand, if, after giving the evidence the most favorable interpretation in favor of the party asserting the issue, an adverse conclusion must be reasonably reached, it is the court's duty to rule on the issue as a matter of law and not permit a jury to speculate. Hamden Lodge v. Ohio Fuel Gas Co. supra; **Belshaw v. Agricultural Ins. Co., 150 Oh St 49.** We declare that this rule for civil cases is equally applicable to an issue of insanity created in a criminal case, where such affirmative defense has been pleaded.

We find no evidence in the record before us which required the submission of this issue to the jury. And in this connection, as well as on the question of "irresistible impulse" we again pronounce the law heretofore stated by this Court in **State v. Cumberworth, 69 Oh Ap 239;**

"To establish insanity as a defense in a criminal action, the defendant must show, by a preponderance of the evidence, that at the time of committing the act he was laboring under such defect of reason from disease of mind as not to know the nature or quality of the act he was doing, or if he did know it, he did not know it was wrong, and it is not sufficient that he knew what he was doing was wrong but that because of disease of mind he did not have the power to resist committing the act and therefore acted under 'irresistible impulse.' "

Reference is also made to State v. Maish, 185 P. (2d) 486, 173 A. L. R. 382, and the annotation on "irresistible impulse as excuse for crimes" in 173 A. L. R. 391.

The evidence furnishes the factual basis for a jury's conclusion as to guilt and its degree, guided by the instructions of the court as to the law. Premeditation and deliberation were adequately defined in the instructions, and although the court did deny the issue of insanity as a defense, nevertheless, the evidence given by the psychiatrist and others was all before the jury and considered in connection with the elements of intent and purpose to kill and to deliberate and premeditate thereon. The jury found that all of the essential elements of the crime were established in spite of the evidence offered and received for the purpose of showing an irresistible impulse at the time of the killing.

We see no error under this claim.

7. There are several other claims of error which we do not believe require discussion. We have examined them carefully and find none of a prejudicial nature.

Prior to the preparation of this opinion, it was, of course, necessary for this Court to read the more than one thousand

pages in the bill of exceptions. We have not deemed it necessary to brief the record in its entirety. The recitation of a few more facts given by the defendant when testifying as a witness in his trial may not, however, be amiss. He said that he had stolen automobiles and committed burglaries in California and was there sent to prison and later paroled; after his parole he traveled to the State of Washington, and there committed burglaries, assaulted a police officer and stole his gun and billfold; he then returned to California, where he stole the Lincoln automobile which later figured in the Cleveland tragedy. From California he drove to Phoenix, Arizona, where he committed another burglary. From Arizona he drove to Cleveland, arriving on December 3, 1951. His conduct from this point on has been substantially set out in former pages of this opinion.

The case before us depicts a shocking crime. Law triumphs over natural impulses aroused by such a crime, only if guilt be ascertained by due regard for those indispensible safeguards which our nation and state have evolved for the ascertainment of guilt. It is not enough that an accused be accorded the mere form of a trial. When life is at stake, it is a requisite that a trial judge should so guide the jury that they may be fully equipped to determine whether death should be the penalty for conduct.

In our study of this case, we are of the opinion that the many safeguards thrown about an accused person by the law have been observed. We believe that the power of the Court was not abused. We believe that the defendant has had a fair trial; and we believe that the evidence shows the defendant guilty of murder in the first degree on each count in the indictment beyond peradventure.

We specifically find no error in the record of a prejudicial character (See §13449-5 GC) and, with this finding, in the fulfillment of our duty, we must affirm the judgment. It will be so ordered. Judgment affirmed.

SKEEL, PJ, HURD, J, concur.