[Cite as *State v. Cantrall*, 2017-Ohio-7399.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   104576

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MATTHEW D. CANTRALL

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-597957-A

**BEFORE:** Boyle, J., Keough, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**   August 31, 2017

**ATTORNEY FOR APPELLANT**

Christopher M. Kelley
55 Public Square, Suite 2100
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:    Lon'Cherie' Billingsley
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

{¶1} Defendant-appellant, Matthew Cantrall, appeals his convictions. He raises one assignment of error for our review:

> The trial court erred in finding that the appellant failed to establish the affirmative defense of not guilty by reason of insanity.

{¶2} Finding no merit to his appeal, we affirm.

## I. Procedural History and Facts

{¶3} In August 2015, Cantrall was indicted on four counts: two counts of fifth-degree felony vandalism in violation of R.C. 2909.05(A) and 2909.05(B)(1)(b), one count of fourth-degree felony vandalism in violation of R.C. 2909.05(B)(1)(a), with a furthermore specification that the value of property damaged was between $7,000 and $150,000, and one count of obstructing official business in violation of R.C. 2921.31(A), a misdemeanor of the second degree.

{¶4} On September 16, 2015, Cantrall requested a referral to the court's psychiatric clinic to be evaluated for competency to stand trial and insanity at the time of the act. He was evaluated by Dr. Ludna Grewal. Dr. Grewal found that Cantrall was competent to stand trial and sane at the time of the act.

{¶5} Cantrall later requested an independent psychological evaluation. He was evaluated by Dr. John Fabian in early December 2015. Dr. Fabian found that Cantrall did not know the wrongfulness of his acts because he suffered from a severe mental disease at the time of the act.

**{¶6}** Cantrall waived his right to a jury trial, and the case proceeded to the bench, where the following facts were presented.

**{¶7}** In July 2015, Cantrall lived in a house that he rented from Ralph Saker. Saker lived next door to Cantrall. Cantrall had rented from Saker since January 2014, without any problems. But in July 2015, Saker testified that Cantrall began spray painting the outside of the house that he rented from Saker. Saker said that Cantrall painted "Satan and Jihad, 666, Satan, devil" on the front, back, and both sides of the house. Saker told Cantrall to stop spray painting the house, but Cantrall refused.

**{¶8}** Saker identified photos that were taken of his rental property that showed where Cantrall spray painted it. Saker said that Cantrall further damaged bushes and trees at the home, and placed strange signs in the yard that did not make sense, including "you see what happens when you mess with * * * warriors" and "nursing home fema camp curse." Cantrall painted "wishing you into cartoonland, 666, satan" on the garage. Cantrall also hung dolls with no heads from a tree. Saker further testified that Cantrall damaged things inside the home as well. Saker said that at one time, Cantrall thought he owned the home that he was renting from Saker. Saker called the police several times regarding these incidents.

**{¶9}** On cross-examination, Saker stated that Mobile Crisis came to Cantrall's home a few times, including on July 10 and July 12, 2015, and that Cantrall was removed by the health squad on July 13. Saker agreed that he called Cantrall's mother on July 10, 2015, and told her that he was concerned about Cantrall's health and safety. Saker

agreed that Cantrall was "taken away" by Mobile Crisis or the "help squad" several times, including on July 24, 2015, when Saker told him to quit spray painting the home. Cantrall was removed by police on July 28. Saker also agreed that Cantrall would see the police and run back into the house.

{¶10} Police responded to Cantrall's home several times in July 2015. One time, police received calls that Cantrall was threatening his neighbors with a knife. When police arrived, Cantrall ran into his home. Police tricked him by acting like they left, and Cantrall came out of his house. Police took custody of him, and took him to the hospital for a mental health evaluation.

{¶11} On July 28, 2015, someone called police again because Cantrall was threatening neighbors with a knife. When police arrived, Cantrall ran into his house and would not come out. Cantrall told police, "I plead the Fifth." Police were trying to remove Cantrall from his home so that they could take him to the hospital. The SWAT team eventually removed Cantrall from his rental home.

{¶12} At the close of the state's case, Cantrall moved for a Crim.R. 29(A) acquittal, which the trial court granted as to the fourth-degree vandalism charge under R.C. 2909.05(B)(1)(b) (damaged property was necessary for the owner or possessor of the property to engage in the owner's or possessor's profession, business, trade, or occupation). The trial court denied it as to the remaining counts: two fifth-degree vandalism charges and obstructing official business.

{¶13} Dr. John Fabian testified on behalf of Cantrall. He explained that he examined Cantrall and interviewed him "for quite some time" about his background, including his mental health history, psychiatric symptoms, criminal history, and the nature of the current criminal case.

{¶14} Dr. Fabian also administered psychological tests, including the adult autism/Asperger's assessment, and a Personality Assessment Inventory to assess Cantrall's mental health issues.

{¶15} Dr. Fabian found that Cantrall did "endorse substantial symptoms related to an autism spectrum disorder." Dr. Fabian explained that people on the autism spectrum have issues with communication, language skills, emotional reciprocity, and obsessive behaviors. Dr. Fabian stated that it was "important" to know this finding because autism is known to be a precursor to schizophrenia, which he stated there is "no question [Cantrall] has that condition."

{¶16} As for the results of the Personality Assessment Inventory, Dr. Fabian testified that "there was evidence of exaggeration." He explained that "exaggeration" did not mean that Cantrall was "malingering," but that he was "cry[ing] for help." Dr. Fabian stated that the "bottom line" was that Cantrall was "mentally ill but he's exaggerating some of [it]." Dr. Fabian testified that overall, there was evidence of Cantrall's paranoia, hallucinations, delusions, abnormal thinking, disorganized thinking, depression, and problems with concentration, sadness, and hopelessness. There was also evidence that Cantrall experienced anxiety, depression, impulsivity, and distrust.

{¶17} Dr. Fabian diagnosed Cantrall with being on the "autism spectrum and now schizophrenia," as well as "multi-schizoaffective disorder, bipolar type." Dr. Fabian explained that in making his assessment, he relied on Cantrall's medical records from St. Vincent Hospital around the time of the offense, which he found to be "germane" to understanding Cantrall's mental state at the time of the offense.

{¶18} Dr. Fabian testified that on July 14 and 24, 2015, Cantrall was hospitalized for psychiatric reasons at St. Vincent Hospital. He stated that these records show that Cantrall had symptoms of psychosis on those dates. Cantrall was also having grandiose and delusional thoughts on those dates. Around this time, Cantrall was spray painting the house that he rented from Saker with demonic symbols. He was also psychotic, manic, delusional, and overall disorganized in his thinking. Cantrall reported that he was practicing witchcraft and was a magician. Dr. Fabian stated that these hospital records show that Cantrall's actions were consistent with a manic psychotic episode.

{¶19} Dr. Fabian explained what schizoaffective disorder meant. He said that the "schizo" represents schizophrenia, which means that the person experiences loss of contact with reality, hearing voices, and having delusions. He said the "affective" part was secondary, and explained "that would be the bipolar mania." Dr. Fabian stated that people are at their "sickest" when they are both psychotic and manic.

{¶20} On July 14, 2015, someone called the Cleveland police about Cantrall. The records indicate that Cantrall was "practicing his religion," and was "very bizarre with disorganized and grandiose thinking and he was delusional." There was also

evidence of paranoia. He was diagnosed with schizoaffective disorder and prescribed lithium.

{¶21} Dr. Brar, a psychiatrist, saw Cantrall again on July 15, 2015. The records show that Cantrall was practicing religion in the streets. Dr. Brar reported that Cantrall believed that he was a genius with an IQ of 140. Cantrall also told him that he was making $400,000 a year at age 23 and owned an All State agency. Cantrall had grandiose ideas. Cantrall said that he was going to protest a chemical plant at a city council meeting, but got kicked out. Dr. Brar stated that Cantrall was paranoid, delusional, and "very psychotic."

{¶22} On July 16, 2015, Dr. Brar saw Cantrall again at St. Vincent Hospital. Dr. Brar reported that Cantrall was "very grandiose and delusional." Dr. Brar said that Cantrall did not have any insight, and his speech was pressured and rambling; he was manic and psychotic.

{¶23} Dr. Brar further reported on July 17, 2015, that Cantrall was again "manic and grandiose, delusional," and that he was "not having thoughts that [were] grounded in reality." Dr. Brar further stated in his report that Cantrall was also having "religion and legal grandiosity that was not based in realities."

{¶24} On July 18, 2015, Dr. Brar diagnosed Cantrall with schizoaffective disorder again, stating that Cantrall's medication levels were low, which indicated that Cantrall was not taking his medications. Dr. Brar reported that Cantrall's thinking was disorganized, and that some of his "delusions were grandiose." Cantrall was chanting

religious prayers in the street in a "peculiar language." When police stopped him, Cantrall stated that he had a "religious right." Cantrall also said that he went to a city hall meeting, and was very disruptive. He got kicked out of the meeting. Dr. Brar stated that Cantrall "still believes in some of the delusions."

**{¶25}** On July 19, 2015, Dr. Brar reported that Cantrall's speech was "less pressured." At that time, she diagnosed Cantrall with bipolar disorder rather than schizoaffective disorder.

**{¶26}** On July 20, 2015, the report indicates that Cantrall was "preaching religion and chanting a strange language in the street." Someone called the police.

**{¶27}** On July 24, 2015, the records indicate that Cantrall was delusional and talking to himself. The St. Vincent Hospital records further state that Cantrall was talking to people who were not there. Cantrall also stated that he would have "a wife tomorrow and children in a couple of days."

**{¶28}** Dr. Fabian testified that in reviewing the St. Vincent Hospital notes, there was a ten-day window of psychosis, mania, and medication noncompliance. Although Cantrall was "improving in his condition" with Dr. Brar, he was still delusional through July 24, 2015. Dr. Fabian stated that the records from St. Vincent Hospital were "the most important part of this evaluation."

**{¶29}** Dr. Fabian testified that in his opinion, Cantrall suffered from a severe mental disease at the time of the offense — schizoaffective disorder, bipolar type, with manic and psychotic episodes.

**{¶30}** Dr. Fabian disagreed with Dr. Grewal's insanity evaluation at the court psychiatric clinic. Dr. Fabian explained that Dr. Grewal diagnosed Cantrall with borderline personality disorder, which would not qualify under the insanity statute as a severe mental disease. But Dr. Fabian said that he did not see any of the symptoms of borderline personality disorder in Cantrall. He said Cantrall "is clearly mentally ill and has a combination of schizophrenia and bipolar disorder."

**{¶31}** Regarding his opinion as to whether Cantrall knew the wrongfulness of his actions, Dr. Fabian stated that was a harder question. Dr. Fabian explained that Cantrall's severe mental disease caused him to think and act irrationally, that he experienced a "lack of contact with reality," and that his actions were psychotic-based. Dr. Fabian said that Cantrall also believed that he was obtaining his house through adverse possession due to religious discrimination, so Cantrall did not think that he could be arrested. Dr. Fabian ultimately opined that Cantrall's "knowledge of the wrongfulness and the illegality of what he was doing * * * was certainly compromised by his psychotic thinking."

**{¶32}** Dr. Fabian stated that his opinion was different from that of Dr. Grewal because Dr. Grewal did not causally link Cantrall's mental illness to his criminal acts. But Dr. Fabian stated that it was negligent for Dr. Grewal not to review the St. Vincent Hospital records. Dr. Fabian further disagreed with Dr. Grewal that Cantrall's actions were not related to his mental disease. Dr. Fabian stated that Cantrall's "criminal behaviors were grounded in psychosis and there was an irrational motive." Dr. Fabian

further opined that due to Cantrall's disorganized psychotic thought process, "he would not really know what he was doing was illegal." Dr. Fabian further testified that his opinions were given with the standard of reasonable degree of psychological certainty.

{¶33} The state called Dr. Lubna Grewal on rebuttal. Dr. Grewal testified that she interviewed Cantrall on October 1 and 8, 2015, for approximately four hours. Dr. Grewal testified that after interviewing Cantrall, she determined that he was sane at the time he committed the act due to a reasonable degree of medical certainty.[1]

{¶34} Dr. Grewal testified that Cantrall gave her a very detailed history of what happened around the time of the alleged offense. Cantrall told her that in July 2015, his relationship with his neighbors and his landlord started deteriorating. Cantrall described the psychiatric symptoms he starting having around May or June of that year. He had symptoms of an "elevated mood." He experienced increased "goal-directed activity," increased energy levels, and a "slight reduction in his need for sleep." Dr. Grewal

---

[1]The dissent claims that Dr. Grewal made an "inappropriate" statement to Cantrall before she began interviewing him — that he would be hospitalized if he were declared legally insane. There is nothing in the record to indicate her statement was "inappropriate." Dr. Grewal informed Cantrall at the beginning of her interview the nature and purpose of her evaluation — to determine if he was competent to stand trial and insane at the time of the act. Dr. Grewal was required to explain the nature and purpose of her evaluation to Cantrall; that is, obtain informed consent from him (both Dr. Grewal and Dr. Fabian stated at the beginning of their written reports that they did so). The "nature" of the proceeding necessarily included informing Cantrall of the consequences of what could occur if he were found insane at the time of the act (i.e., what could occur is that he would be committed to a hospital for treatment). *See* R.C. 2945.40. We find nothing inappropriate about this, and indeed, believe that Dr. Grewal acted entirely appropriate. And even if Dr. Grewal had not informed Cantrall as much, his defense counsel should have. Moreover, if Cantrall was thinking "clearly and rationally" at the time of Dr. Grewal's evaluation of him, which the dissent asserts he was (because he had been "consistently taking his medication for several months"), then he certainly understood what was occurring and could possibly occur as a result of the evaluation.

testified that "all of those symptoms are signs consistent with mania." She opined that "it did seem that he was suffering from a bipolar disorder at the time the acts were committed."

{¶35} Dr. Grewal stated that Cantrall told her that he was not having any auditory or visual hallucinations, and was not suffering from any delusions. Cantrall told her that throughout his life he had various religious beliefs, but they "had not necessarily changed in nature as he developed these symptoms." As for Cantrall being paranoid, Dr. Grewal testified that although Cantrall talked about being "sensitive to other people basically slighting him in some way," she did not feel that it rose to the level of "any delusion * * * that has to be fixed."

{¶36} Cantrall told Dr. Grewal that he believed his landlord was discriminating against him because he had "atypical religious beliefs." She explained that when it comes to "religious beliefs it is very difficult to clearly discern what crosses over into some minor psychosis versus just an atypical or non-mainstream belief." But most important to Dr. Grewal's opinion was that Cantrall was able to "somewhat incorporate information that would oppose his view and accept that." Cantrall was also able to "say that maybe he was misperceiving what was happening."

{¶37} Cantrall told Dr. Grewal that he had gone to a town meeting on July 9, 2015. At that time, Cantrall had "some concerns about a building and some chemical pollution that was happening in the area." Cantrall stated that the town hall meeting was "tense," and that it caused tensions between him and his neighbors.

{¶38} Around this same time, Cantrall was "engaging in a lot of religious rituals outside." Cantrall stated that he believed in "the Hare Krishna, the religion of Santeria, also Wiccan beliefs, and also satanism." Cantrall said that he was creating artwork and displaying it outside. Cantrall told her that he hung a baby doll from a tree, wrote the letters "666" on it, and placed a "knife in its mouth." Cantrall told Dr. Grewal that he was "building a case of religious discrimination against his landlord." Cantrall believed the police would "confiscate" the doll and "that would bolster his case." She agreed that this meant that Cantrall had "some knowledge of how to build a legal case against his landlord."

{¶39} Dr. Grewal said that Cantrall was aware that people were calling the police about him, but the police never told him that he was doing something wrong. She stated that the most "compelling evidence about his knowledge of wrongfulness was mostly that he was describing some relatively rational motives for his behaviors, which included building a case for religious discrimination." Also compelling to Dr. Grewal's opinion that Cantrall was acting rationally was what Cantrall described as "culture jamming." Cantrall stated that "was basically kind of a provocative way to force people to be more aware of minority beliefs, of the freedom of expression, freedom of religion and so both of those things were important to him." Dr. Grewal did not believe that these motives were linked to his severe mental disease. Rather, they were personal beliefs that he had.

{¶40} Dr. Grewal further testified that Cantrall told her the day the police came he was outside. As the police car pulled up, Cantrall went in his house. Dr. Grewal stated

that suggested to her that Cantrall did not want to be apprehended by police and knew that he did something wrong. Once Cantrall was inside, he was "pretty nervous." He would not let the police inside. He was not sure that they were there to arrest him, but he did not want to go outside. He told Dr. Grewal that he went to the window and said, "I plead the Fifth." He also told her that he asked if they had a warrant; if so, he would "come out."

{¶41} Cantrall also told Dr. Grewal that he started drinking alcohol when he was in his house and the police were outside because he was upset. He also began searching for an attorney online and even contacted one to discuss his case. The attorney told him to go outside and comply with police orders. But before he could, the SWAT team came in his home. Dr. Grewal believed that Cantrall's actions were rational.

{¶42} Dr. Grewal said that in order for someone to be legally insane, the statute requires evidence that the person's mental disease causes the person to not know the wrongfulness of their actions. Dr. Grewal stated that Cantrall talked about believing he had a right to spray paint the garage because he rented the place and "it belonged to him in some ways." Cantrall's beliefs about freedom of religion and freedom of expression "are actually matters of law he is contesting." Thus, she did not believe that his severe mental disease "was causing him to not know the wrongfulness of his actions."

{¶43} Dr. Grewal diagnosed Cantrall with "an other specified bipolar disorder." When she interviewed him, he did not report psychotic symptoms. When she received Dr. Fabian's report, she attempted to get Cantrall's medical records "at least three or four

times from St. Vincent" to get more information, but she never received them. She agreed that after reading Dr. Fabian's report, which thoroughly describes Cantrall's St. Vincent Hospital medical records, that the records "suggest that there was also elements of psychosis along with his mania." But Dr. Grewal stated that even if Cantrall was bipolar and psychotic, that did not mean that he did not know the wrongfulness of his actions. She testified that after reviewing Dr. Fabian's report, she would have amended her report if she would have read something that changed her opinion. But she did not read anything in Dr. Fabian's report that changed her ultimate opinion that Cantrall was not insane at the time of the act. She read things that made her change her diagnosis, adding the psychotic features of his illness, but that did not change her opinion on the ultimate issue of insanity.

{¶44} Dr. Grewal explained that, in general, a person can have psychosis, and still know the wrongfulness of his or her actions. She compared the situation to someone who does not know the wrongfulness of his or her actions, namely, when a person states that they acted a certain way because "God told them to act that way."

{¶45} Dr. Grewal testified that she questioned the reliability of Dr. Fabian's report because in some parts Cantrall reported to Dr. Fabian that he was out of his mind and did not know what he was doing, and in other parts he stated that he was doing it for religious freedom and freedom of expression.

{¶46} On cross-examination, Dr. Grewal testified that she told Cantrall that if he was found legally insane, he could be hospitalized. Cantrall expressed concerns about

that and that is why, at that time, he was not certain that he wanted to pursue an insanity defense.

{¶47} The trial court showed Dr. Grewal the state's exhibits, which were photos of the damage that Cantrall did to his rental property. After seeing them, Dr. Grewal did not change her opinion. She said they suggested that Cantrall "was disorganized and that he was paranoid," but that did not mean that he did not know what he was doing was wrong.

{¶48} The trial court found Cantrall guilty of the remaining counts: two counts of fifth-degree felony vandalism in violation of R.C. 2909.05(A) and 2909.05(B)(1)(b), and one count of obstructing official business in violation of R.C. 2921.31(A), a misdemeanor of the second degree. The trial court sentenced Cantrall to two years of community control sanctions on each count to be served concurrently, and advised Cantrall that if he violated the terms of his supervision, it would sentence him to six months of prison on Count 1 (R.C. 2909.05(A)), 90 days on Count 2 (R.C. 2909.05(B)(1)(b)), and six months on Count 3 (R.C. 2921.31(A)), to be served concurrently. It is from this judgment that Cantrall appeals.

## II. Not Guilty by Reason of Insanity Defense

{¶49} In his sole assignment of error, Cantrall contends that the trial court erred when it found that he did not establish that he was insane at the time of the acts.

{¶50} R.C. 2901.01(A)(14) provides that "[a] person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves * * * that at the time

of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." Not guilty by reason of insanity is an affirmative defense that a defendant must prove by a preponderance of the evidence. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 64, citing R.C. 2901.05(A) and 2901.01(A)(14).

{¶51} Cantrall's argument is essentially a question of the weight of the evidence, i.e., was the trial court's finding — that he did not prove by a preponderance of the evidence that he was insane at the time of the acts — against the manifest weight of the evidence.

{¶52} A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶53} To meet his burden in this case, Cantrall had to persuade the trier of fact that, at the time he committed the offense, he did not know the wrongfulness of his acts due to a severe mental disease or defect. R.C. 2901.01(A)(14). When reasonable minds may reach different conclusions upon the question of insanity based on the evidence presented, such question is normally one for the trier of fact. *State v. Brown*, 6th Dist. Sandusky No. S-11-031, 2013-Ohio-839, ¶ 13-14, citing *State v. Ross*, 92 Ohio

App. 29, 62 Ohio Law Abs. 562, 108 N.E.2d 77 (8th Dist.1952). Indeed, the Ohio Supreme Court has held that "[t]he weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of facts." *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982).

{¶54} Cantrall argues, however, that in this case, reasonable minds could not reach different conclusions on the question of his insanity at the time of the act because only Dr. Fabian reviewed the medical records from St. Vincent Hospital from July 2015, when he committed the acts. Cantrall contends that Dr. Grewal could not offer substantive rebuttal testimony that he was sane at the time of the act without reviewing the medical records. He further maintains that Dr. Grewal's assessment can only provide an opinion as to his sanity in October 2015, months after the incidents, and after he had been taking his medications.

{¶55} At the outset, we note that there is no dispute in this case that Cantrall suffered from a severe mental disease or defect (in its closing argument, the state conceded as much). The sole issue is whether Cantrall's severe mental disease or defect caused him to not know the wrongfulness of his actions.

{¶56} After reviewing the evidence presented, we simply cannot say that the trial court lost its way when it found that Cantrall did not establish that he was insane at the time of the act. In his argument, Cantrall focuses mostly on the fact that the medical records show that he was experiencing psychosis at the time of the acts. But again, the

state does not dispute this fact. Notably, in the argument section of his brief, Cantrall does not even mention — let alone argue — that his psychosis caused him to not know the wrongfulness of his acts.

**{¶57}** Dr. Grewal testified that after reading Dr. Fabian's report regarding the medical records, she changed her diagnosis, agreeing with Dr. Fabian that Cantrall showed signs of "psychosis along with his mania." But she stated that she did not read anything in Dr. Fabian's report that changed her ultimate opinion that Cantrall was not insane at the time of the act based on the legal definition of insanity — because she still believed that based on his actions in July 2015, he knew what he was doing was wrong.

**{¶58}** Dr. Grewal found that Cantrall had "multiple rational motives to his behavior," which showed that he knew the wrongfulness of his actions. She based her opinion on many factors, including the fact that Cantrall had "some relatively rational motives" for his behavior, including "culture jamming" and building a case of religious discrimination against his landlord.

**{¶59}** She further relied on the fact that when Cantrall saw the police on the day he was arrested, he immediately went into his house. She opined that his reaction to seeing the police suggested he knew that he had done something wrong. Dr. Grewal also found it compelling that Cantrall began searching for an attorney when he was inside his house, and even called one to discuss his options. Dr. Grewal also relied on the fact that Cantrall told police that he was pleading "the Fifth." She found that this suggested that Cantrall knew what he did was wrong. She opined that Cantrall's actions were rational,

considering what was occurring. We agree that these actions support the conclusion that Cantrall knew the wrongfulness of his actions.

{¶60} Although Cantrall argues that the fact that he went inside his house when he saw the police only shows that he did not want to go back to the hospital, there is no evidence of that. It was Dr. Fabian's opinion that Cantrall hid from police because he did not want to go back to the hospital. But it was not an established fact. It is our view that reasonable minds could come to different conclusions as to the reason Cantrall went inside when he saw the police.

{¶61} Cantrall argues that because Dr. Grewal's opinion is based on interviews with Cantrall that took place in October 2015, she relied on Cantrall self-reporting, and not on the doctor who examined him at the time of the acts. We disagree. Again, Cantrall's arguments are centered around the St. Vincent Hospital doctor diagnosing him as psychotic in July 2015, which is not at issue in this case. Although Dr. Grewal did not view the St. Vincent Hospital records, her ultimate opinion, that Cantrall knew the wrongfulness of his actions, was based on events that occurred at the time of Cantrall's arrest on July 28, 2015.

{¶62} Moreover, we note that even Dr. Fabian agreed that whether Cantrall knew the wrongfulness of his actions was a harder question than whether Cantrall had a severe mental disease or defect. In fact, Dr. Fabian's entire testimony regarding whether Cantrall knew the wrongfulness of his actions amounted to a mere 20 lines (not even one page) of the transcript out of 60 pages of testimony; in his remaining testimony, he

discussed Cantrall's mental disease or defect — but again, that was not at issue. Although Dr. Fabian ultimately opined that Cantrall did not know the wrongfulness of his actions because of Cantrall's "lack of contact with reality," we still cannot say that the trial court's finding — that Cantrall did not establish that he was insane at the time of the act — was against the manifest weight of the evidence.

**{¶63}** Accordingly, Cantrall's sole assignment of error is overruled.

**{¶64}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, JUDGE

MELODY J. STEWART, J., CONCURS;
KATHLEEN ANN KEOUGH, A.J., DISSENTS WITH DISSENTING
OPINION

KATHLEEN ANN KEOUGH, A.J., DISSENTING:

**{¶65}** Respectfully, I dissent. I would hold that the trial court's judgment that Cantrall was sane at the time of the acts was against the manifest weight of the evidence and, accordingly, I would vacate Cantrall's conviction.

**{¶66}** In reaching its verdict, the trial court relied solely upon Dr. Grewal's opinion that at the time he committed the offenses, Cantrall understood the wrongfulness of his acts. But Dr. Grewal's report is obviously flawed and unreliable.

**{¶67}** First, Dr. Grewal interviewed Cantrall in October 2015, well after the incident at issue and after he had been consistently taking his medication for several months and could once again think clearly and rationally. She testified that before she began interviewing Cantrall, she told him that he would be hospitalized if he were found insane. Cantrall immediately expressed concern about being hospitalized again. Nevertheless, Dr. Grewal conducted the interview and wrote her report, despite setting the stage with a statement that would obviously affect Cantrall's answers in his effort to avoid being hospitalized again.

**{¶68}** Furthermore, although Dr. Grewal testified several times that there "was nothing" in the July 2015 records from St. Vincent Hospital indicating that Cantrall did not appreciate the wrongfulness of his acts, she also testified that she never reviewed the records. She admitted that she only reviewed Dr. Fabian's report, which she acknowledged merely "summarized" the records. Because the St. Vincent Hospital records regarding Cantrall's psychosis in the ten days leading to his arrest were essential to understanding his state of mind on the date of his arrest, Dr. Grewal was negligent in

not obtaining the records before writing her report. As a result, her report was materially deficient.

{¶69} Moreover, Dr. Grewal simply assumed that Cantrall understood the wrongfulness of his actions because he went into the house on July 28, 2015, when the police arrived. The trial court based its conclusion that Cantrall was sane solely on this theory by Dr. Grewal. But Dr. Grewal acknowledged that Cantrall never told her that he ran into the house to avoid apprehension, and the record does not support her conclusion. Rather, the record demonstrates that Cantrall, who had been admitted to St. Vincent Hospital twice within the 14 days prior to the incident at issue and desperately wanted to avoid being hospitalized again, ran into the house to avoid being taken back to the hospital, not because he knew that what he had done was wrong. In fact, the record reflects that Cleveland police took Cantrall to St. Vincent Hospital on July 14, 2015, when he was hospitalized the first time. In the days following his first hospitalization, the police responded to numerous complaints about Cantrall, and Saker testified that every time Cantrall saw the police, he would run into the house.

{¶70} In light of Dr. Grewal's inappropriate statement to Cantrall that he would be hospitalized if he were found insane, her failure to review the St. Vincent Hospital records regarding Cantrall's psychosis and mania in the ten days prior to the incident that led to his arrest, and her incorrect assumption that Cantrall understood the wrongfulness of his actions merely because he ran into his house when the police arrived, I find that the

trial court erred in relying upon Dr. Grewal's report in finding Cantrall sane at the time of the offense.

{¶71} Significantly, Dr. Fabian's report —which included the records from St. Vincent Hospital — noted that Cantrall was diagnosed there with schizoaffective disorder. Because Dr. Grewal did not review the St. Vincent Hospital records, she totally missed this diagnosis. Moreover, despite Cantrall's two hospitalizations, Dr. Grewal diagnosed him as suffering only from borderline personality disorder, a mental illness that generally does not require any hospitalization.

{¶72} Dr. Fabian determined that due to his psychotic thinking, Cantrall would not have known on July 28, 2015, that what he was doing was illegal. In light of the deficiencies with Dr. Grewal's report explained above, I would find that the trial court erred in ignoring Dr. Fabian's expert opinion that Cantrall did not appreciate the wrongfulness of his acts. Accordingly, I would sustain the assignment of error, find that Cantrall established the affirmative defense of not guilty by reason of insanity, and vacate his conviction.